CANADA DRY GINGER ALE, INC., APPELLANT, v. F & A DISTRIBUTING CO., GILLHAUS BEVERAGE CO., INC., MERCHANTS WINE AND LIQUOR CO., AND DIVISION OF ALCOHOLIC BEVERAGE CONTROL, RESPONDENTS.

Argued November 5, 1958—Decided December 15, 1958.

*Mr. Edward J. O'Mara* argued the cause for the appellant (*Messrs. O'Mara, Schumann, Davis & Lynch,* attorneys).

*Mr. Harold H. Fisher* argued the cause for the respondents F & A Distributing Co., Gillhaus Beverage Co., Inc., Merchants Wine and Liquor Co. (*Messrs. Green & Yanoff,* attorneys; *Messrs. Shanley & Fisher,* of counsel).

*Mr. Samuel B. Helfand,* Deputy Attorney General, argued the cause for the Division of Alcoholic Beverage Control (*Mr. David D. Furman,* Attorney General, attorney).

The opinion of the court was delivered by

PROCTOR, J. This is an appeal by Canada Dry Ginger Ale, Inc., under *R. R.* 4:88–8, from an order of the Director of the Division of Alcoholic Beverage Control granting relief on three separate petitions filed pursuant to *N. J. S. A.* 33:1–93.1 *et seq.* This section of the Alcoholic Beverage Law, *N. J. S. A.* 33:1–1 *et seq.,* prohibits a distiller of alcoholic liquors from arbitrarily refusing to sell to any licensed wholesaler. The petitioners, F & A Distributing Co., Gillhaus Beverage Co., Inc., and Merchants Wine and Liquor Co., are duly licensed New Jersey wholesalers of alcoholic liquors. Canada Dry is engaged in the manufacture, distilling and importing of nationally advertised brands of alcoholic liquors. Each petition sought the same relief under the statute, alleging that the refusal of Canada Dry to sell its products to the petitioner was "arbitrary, unreasonable and discriminatory." The issue being the same in each case, the hearer consolidated the three petitions by consent and after a hearing filed a single report in which he concluded that the petitioners had established that the action of Canada Dry was arbitrary and discriminatory. Exceptions to the hearer's report were filed with the Director by Canada Dry and also by Joseph E. Seagrams & Sons, Inc., which had been permitted to intervene. The Director accepted the recommendation of the hearer and entered an order directing Canada Dry to "sell and continue to sell

to each of the three petitioners alcoholic beverages on terms usually and normally required by respondent [Canada Dry]." We certified Canada Dry's appeal on our own motion prior to its consideration by the Appellate Division.

The present case arises from Canada Dry's decision to reduce the number of its New Jersey wholesale distributors from 11 to 5. The petitioners were among the six eliminated. Complete lines of Canada Dry products have been carried by F & A Distributing Co. for over 20 years, by Gillhaus Beverage Co., Inc. since 1955, and by Merchants Wine and Liquor Co. since 1953. No written contracts were entered into between the petitioners and the company, and so far as it appears there were no territorial restrictions within the State in which Canada Dry products might be sold by any of the original 11 wholesalers.

In 1956 Paul J. Burnside was advanced by Canada Dry to the position of national sales manager. He informed Alfred P. LaPorte, Canada Dry's Eastern Division sales manager, that the company was displeased with the sale of its products, particularly non-scotch items, in New Jersey and he asked him to survey the market and submit recommendations to improve the situation. Accordingly, LaPorte visited each of the 11 wholesalers a number of times and discussed with them future plans regarding advertising and increased sales crews. Thereafter, he recommended to Burnside "for the betterment of our brand" a reduction of Canada Dry's New Jersey wholesalers from 11 to 5. It was LaPorte's belief that the reduction would increase sales by concentrating distribution outlets and that "the remaining five would have a great deal more interest in our line and would do a much better selling job on our items." Such procedure had been successful in other major United States markets. He also specified his choice of the five wholesalers who should be retained. In explaining how he made this selection he stated:

"A. It was a very difficult decision but in making the decision I felt, just through my experience in the business, of the type of organization that we would retain would be types that seemed to show

aggressiveness in the few conferences that I had with them, that had an ample selling force in order to sell our line. Those were factors that I took into consideration."

He later testified:

"Q. Now I am asking you specifically, what factors entered into your determination to retain these five and to drop these six?
A. Well, the factors as outlined before, consideration of other lines within the houses, the sales force, the aggressiveness, my reaction to the aggressiveness of their sales force, the attitude of their executives towards discussions of advertising and sales potential for our brands. All of this together made me consider this move."

Past sales were considered but more emphasis was placed on the future potential. LaPorte admitted on cross-examination that no wholesaler had shown a greater increase in purchases of non-scotch items than the petitioner F & A Distributing Co. Canada Dry was selling all the scotch items it was able to allocate to New Jersey.

Burnside agreed with LaPorte that the reduction in the number of wholesalers from 11 to 5 should be made because "we are just cutting the pie in too many pieces." As to the specific wholesalers to be dropped and the others to be retained, Burnside said:

"A. Well, we considered several factors. One was our relationship with the five jobbers we proposed to retain; we also considered their sales executives, their sales personnel and feeling of these people towards our organization; the other competitive brands which they carry.
\* \* \* \* \* \* \* \*
A. We picked the wholesalers that we thought we could work best with and I might say at this time, as an example, if we had eleven applicants for a position and we picked five, that doesn't mean the other six are not any good. But in our opinion and our considered judgment we felt that the five we selected could do the best job for our company."

He further testified:

"Q. Do I understand, Mr. Burnside, then that you used no standard in determining which of these wholesalers were going to be continued and which were going to be dropped?
\* \* \* \* \* \* \* \*

A. We don't have any chart or there is no particular standard that you can set for determining which distributor you may retain in a given market.

Q. Now, in reaching this conclusion, Mr. Burnside, were there any requirements that you set up which the wholesalers were to meet in order to be retained?

\*      \*      \*      \*      \*      \*      \*      \*

A. No."

After Burnside reached his decision he discussed it with his superior, John W. Red, Jr., a vice-president of the company, who agreed with the reasons listed by LaPorte and Burnside for their selection of the five wholesalers. He testified:

"Q. Will you give me those reasons that were listed?

A. Well, there are a number of them which I have touched on, Mr. Green. One is the attitude of the organizations themselves as indicated to our men; the attitude of the management of the organization; the number of competitive lines; the number of salesmen; the general aggressiveness of the organization; our opinion, our considered business judgment of their ability to do a good job on the Canada Dry line; their general interest in being a Canada Dry distributor."

On March 14, 1957 LaPorte advised petitioners that they were being discontinued as distributors as of May 1st. The only reason given was that throughout the country the company was reducing the number of its distributors and that it was for the best interest of the company to reduce the number in New Jersey from 11 to 5. The petitioners' ability to pay for any merchandise was not questioned. On April 11 this decision was confirmed by a letter from Burnside. Subsequent discussions between the parties concerning a reconsideration proved fruitless.

The hearer determined that Canada Dry's method of selecting the retained wholesalers was "arbitrary and discriminatory." He rejected the argument that the selection was not arbitrary because it resulted from sound business judgment. The Director concurred, holding that Canada Dry's "refusal to continue to sell its nationally advertised products to the petitioners, while continuing to sell such

products to other wholesalers similarly situated, was without reasonable or adequate cause and constituted arbitrary discrimination within the meaning of the statute."

The statute here involved was added by *chapter* 264 of the *Laws of* 1942 (*N. J. S. A.* 33:1–93.1 to 93.5), as a supplement to the Alcoholic Beverage Law, *N. J. S. A.* 33:1–1 *et seq.*, and provides as follows:

"1. There shall be no discrimination in the sale of alcoholic liquors by distillers, importers, and rectifiers of nationally advertised brands of alcoholic liquors to duly licensed wholesalers of alcoholic liquors in this State.

2. In the event any distiller, importer, or rectifier shall refuse to sell to any individual wholesaler any amount of alcoholic liquor or comply with the provisions of this act, then the wholesaler shall petition the Commissioner of Alcoholic Beverage Control setting forth the facts and demanding a hearing thereon to determine whether such refusal to sell is arbitrary or not.

3. If the Commissioner of Alcoholic Beverage Control is satisfied with the ability of the wholesaler to pay for such merchandise as ordered, he shall order the distiller, importer, or rectifier to complete said sale of alcoholic liquor to the wholesaler.

4. In the event the distiller, importer, or rectifier refuses to complete the sale or comply with the terms of the order of the Commissioner, the Commissioner shall issue an order to every licensed wholesaler prohibiting the purchase by such wholesaler of any alcoholic liquor product of the said distiller, importer or rectifier directly or indirectly until there is strict compliance by the distiller, importer, or rectifier with the order of the Commissioner of Alcoholic Beverage Control.

5. The State Commissioner of Alcoholic Beverage Control shall adopt and promulgate such rules and regulations as may be necessary to carry out and insure compliance with the provisions of this act."

The title of Commissioner was changed to Director by *L.* 1948, *c.* 439, § 16, *p.* 1712 (*N. J. S. A.* 52:17B–16).

The above act has been the subject of only one judicial decision. *Hoffman v. Hock,* 8 *N. J.* 397 (1952). In that case a distiller, who was also a licensed wholesaler in this State, determined to sell directly to retailers in the northern part of the State, thereby eliminating the wholesalers in that section with whom it had previously dealt. It continued to operate through wholesalers in the southern and western parts of the State. One of the wholesalers who had been

452

eliminated presented two orders for specified quantities of liquor with the distiller. Upon the latter's refusal to fill the orders, the wholesaler instituted a proceeding before the Director for a determination as to whether the aforesaid refusal was arbitrary within the intendment of the statute. This court, in affirming the Director's denial of the petition, held that the statute did not intend that the ability of the wholesaler to pay is the sole test to determine whether or not a refusal to sell is arbitrary and discriminatory. It further held that the statute does not prohibit a distiller from selling its products directly to retailers if its business policy so dictates, provided it is licensed to do so; that such policy is not discriminatory within the intendment of the statute as all wholesalers similarly situated are treated alike. Justice Ackerson speaking for the court said:

"* * * what is prohibited by this legislation is an act of arbitrary discrimination between wholesalers by a distiller in the sale of a nationally advertised product and that in order to grant the relief provided for the Director not only must find that the complaining wholesaler or distributor is able to pay for the product ordered but that the distiller's refusal to sell to him is discriminatory and arbitrary, and the inquiry must be limited solely to such considerations. * * * * * * * *
The apparent scope of the statute in question is to be found in section 1 thereof which bars 'discrimination in the sale of alcoholic liquors by distillers, * * * of nationally advertised brands' thereof 'to duly licensed wholesalers of alcoholic liquors * * *.' Thus it is still open to the distiller to sell directly to retail dealers if licensed so to do. It may, of course, sell indirectly through the medium of duly licensed wholesalers, if it so chooses, but in the latter event it may not discriminate between such wholesalers." 8 N. J. at pages 408–409.

The court found no arbitrary discrimination in the retention by the distiller of its wholesalers in the southern and western parts of the State. It said:

"The fact that the distiller * * * still operates through wholesalers in southern and western parts of the State, whose authorizations are limited to such areas, does not make its action with respect to the crowded northern counties, where retailers are closer

together and more easily reached, an arbitrary or unfair discrimination against its former distributors in such counties whose authorizations had been confined thereto." *Id.*, 8 *N. J.* at *page* 410.

■ Canada Dry on this appeal initially asserts that the Director erroneously placed the burden of proof upon it rather than upon the petitioners, who normally must bear that burden in an administrative proceeding. It further contends that there was no proof that the petitioners were better qualified than the five wholesalers who were retained. These arguments proceed from the following statements of the Director:

"I have carefully examined the entire record herein and I am unable to find any justification for respondent's action concerning the three petitioners. If respondent's action is based on fair and adequate cause, it is not reflected in the record.

\* \* \* \* \* \* \* \*

\* \* \* the petitioners have been shown to be in a position in no way different from the wholesalers retained by the respondent."

Canada Dry has not been obliged to show anything beyond what the statute requires. Petitioners have shown that Canada Dry has refused to deal further with them while continuing to sell to other wholesalers. Canada Dry is in a far better position than the petitioners to know why this action was taken. It is reasonable to require it to come forward with an explanation and factual statement so that the Director may effectively fulfill his statutory duty and determine whether the refusal to sell was the result of a decision fairly arrived at or was arbitrary within the statutory prohibition. This is the only feasible manner in which the statutory hearing can be conducted. See 9 *Wigmore, Evidence* (*3d ed.* 1940), § 2486; *Swain v. Neeld,* 28 *N. J.* 60, 65 (1958); *Ocean County National Bank v. Stillwell,* 123 *N. J. Eq.* 337, 343 (*E. & A.* 1938). In order to prevail it was not necessary for the petitioners to show that they were superior to the retained wholesalers. The statute contemplates that those in similar positions are entitled to similar treatment.

■ Canada Dry next contends that: "Accepting *arguendo* the Director's basic finding that the three petitioners were as equally qualified as the retained wholesalers, his ultimate finding that Canada Dry's selection of the five retained wholesalers was arbitrary and discriminatory deprives Canada Dry, without due process of law, of its inherent right to manage its own business." Reliance is placed upon a number of cases under the Sherman Anti-Trust Act, 15 *U. S. C. A.* § 1 *et seq.*, upholding a manufacturer's right to select among distributors of his particular product. See *e. g., United States v. Colgate & Co.*, 250 *U. S.* 300, 39 *S. Ct.* 465, 63 *L. Ed.* 992 (1919); *Packard Motor Car Co. v. Webster Motor Car Co.*, 100 *U. S. App. D. C.* 161, 243 *F. 2d* 418 (*D. C. Cir.* 1957). These cases do not apply to the present situation. Our Appellate Division in *Eskridge v. Division of Alcoholic Beverage Control*, 30 *N. J. Super.* 472, 474 (*App. Div.* 1954) appropriately stated that:

"* * * there is no common, inherent, natural or constitutional right to engage in the business of selling liquor. The power of the State over the sale of intoxicating beverages is plenary. 'It is a subject by itself, to the treatment of which all the analogies of the law appropriate to other topics cannot be applied.' *Paul v. Gloucester County*, 50 *N. J. L.* 585, 595 (*E. & A.* 1888)."

The inherent social dangers of the liquor industry are evident and the State may rightly prohibit the business entirely or permit it to continue under very severe restrictions. *X-L Liquors, Inc., v. Taylor*, 17 *N. J.* 444, 449 (1955); *Ziffrin, Inc., v. Reeves*, 308 *U. S.* 132, 60 *S. Ct.* 163, 84 *L. Ed.* 128, 129 (1939). The statute in the present case, *N. J. S. A.* 33:1–93.1 to 93.5, is one section of the comprehensive control which the State exercises over all phases of the liquor industry. The correctness of the Director's decision must be determined from an inquiry directed to whether he has correctly ascertained the legislative intent embodied in this statute and has accordingly applied it to the record before him. If the Director has done this, the fact that his decision restricts Canada Dry's

management prerogative in some degree does not deprive it of any constitutionally protected right.

The ultimate goal sought to be attained by the statute in question, as in the entire scheme of liquor legislation, is the protection of the public through the promotion of temperance and elimination of the racketeer and bootlegger. *N. J. S. A.* 33:1-3. In order to accomplish this purpose the statute seeks to achieve as far as necessary the independence of wholesalers from distillers. A wholesaler dependent upon a distiller for a supply of sought-after merchandise might be tempted to comply with the non-legitimate desires of the distiller if the latter were free to discontinue the supply at will. For the purpose of strengthening the wholesaler's resistance if confronted with a distiller's wish to over-stimulate sales and thus negate the public policy in favor of temperance or a desire to engage in other prohibited acts, *e. g.,* tie-in sales, the statute seeks to prevent the distiller from arbitrarily closing the source of supply to a wholesaler. To effectuate this end, both the statute and the authority delegated by it to the Director will be liberally construed. See *Butler Oak Tavern v. Division of Alcoholic Beverage Control,* 20 *N. J.* 373, 384 (1956); 3 *Sutherland, Statutory Construction* (*3d ed.* 1943), § 7203. The act itself dictates such a construction. *N. J. S. A.* 33:1-73.

Section 2 of the statute gives the Director authority to determine whether a refusal by a distiller to sell to a wholesaler is arbitrary or not. Implicit therein is a recognition that there is an area in which a distiller may justifiably refuse to sell to a wholesaler even though the latter is financially responsible. Canada Dry's initial decision to reduce its number of wholesalers within the State does not in itself contravene the statute. While the Director is not authorized to command a distiller to distribute his product to every wholesaler who desires to purchase it, the Director is empowered to determine whether a reasonable method has been employed by a distiller in the selection of wholesalers with whom he will or will not deal. *Hoffman v. Hock, supra.* Whether such a reasonable method has been em-

ployed by Canada Dry in implementing its decision to reduce the number of its wholesalers was the precise issue for the Director's determination, subject, of course, to judicial review. If the selection of the five wholesalers to be retained was determined on a rational basis, consistent with the overall policy of the Alcoholic Beverage Law, the petitioners' claims cannot be sustained.

The Director concluded that the record fails to disclose that the petitioners stand in any different position than the five wholesalers who have been retained, and that in the absence of any justification for the distinction which Canada Dry has made, the selection must be viewed as arbitrary and prohibited by the statute. " 'Arbitrary' means '[d]epending on will or discretion,' that is, not governed by any fixed rules or standards." *Paul v. Board of Zoning Appeals,* 142 *Conn.* 40, 110 *A.* 2d 619, 621 (*Sup. Ct. Err.* 1955); see also *State v. Then,* 114 *N. J. L.* 413, 418–419 (*Sup. Ct.* 1935). The executives of Canada Dry who testified, repeatedly asserted that the individual selections were the result of a good faith business decision and as such could not be viewed as arbitrary. We have no reason to doubt their credibility. But an individual's *bona fide* business policy in the field of liquor traffic must yield to the policy of the State. *Guill v. Mayor, etc., of Hoboken,* 21 *N. J.* 574 (1956). Clearly, a business policy which results in arbitrary discrimination would be violative of the statute. In order to effectuate the statutory provisions, lack of arbitrariness must appear from the whole record. There must be a showing that the selection of certain wholesalers to the exclusion of others was made on the basis of a standard reasonably related to the legitimate business goal sought to be achieved and not conducive to the evils which the act is designed to prevent. This standard must be of such a tangible or objective nature as will enable the Director to determine from the proofs whether its application to the wholesalers in question could reasonably result in the distinction which a distiller has made. The *Hoffman* case, *supra,* serves to illustrate one such standard, *i. e.,* territorial

location of wholesalers. Of course, there are other objective factors wherein a proper distinction may be made. Their sufficiency in each case is to be determined in the first instance by the Director. We realize that some subjective considerations enter into all business decisions. But if the statute is to have any meaning they alone cannot be considered as a sufficient basis for a distiller's severance of his business relations with certain wholesalers while he continues to operate through others.

■ Canada Dry has set forth the factors which it considered in making its selection. Some of these were, as characterized by the Director, "subjective factors of nebulous quality." There were others, *i. e.,* the number of competitive lines, the number of salesmen and past sales, that were of an objective nature. Their application could have been demonstrated. However, Canada Dry made no attempt to document its objective criteria and there is nothing in the record to show that the five wholesalers who have been retained can be distinguished on the basis of these criteria from the petitioners. To sanction different treatment to wholesalers similarly situated would tend to engender those evils which the statute seeks to prevent. On the present record we cannot say that the Director erred. Appellant's showing failed to reveal in depth the underlying facts from which the Director could evaluate the reasonableness of the appellant's actions, including the basis of selection, in the light of the statutory policy described above. We frankly appreciate that the statute immediately involved is not as explicit as it might be. To guide distillers the Director might well adopt implementing regulations at an early date which would delineate the grounds and the nature of the showing required. In these circumstances we reserve to appellant leave to apply to the Director for a rehearing at which time it may adduce such additional testimony as may be relevant in view of this opinion. The decision of the Director is therefore affirmed, without prejudice to such application for rehearing.

FRANCIS, J. (concurring). I concur in the affirmance of the order under review. But the effect of the majority opinion is that a distiller may select a certain number of wholesalers and deal with them to the exclusion of all others, and once having done so the only duty imposed by the statute is to refrain from arbitrary discrimination among them in the sale of his products. In my judgment, approval of the Director's order should be reached on broader premises.

When language employed by the Legislature is clear and unambiguous, the interpretive function of the judicial branch of the government is simple and confined. The law should be applied as written. Under our tripartite system of government, we cannot concern ourselves with matters of legislative wisdom or policy. If the constitutional power exists to promulgate the particular fiat, it must be accepted even if personally we believe it to be a legislative mistake. Nor can the judiciary under the guise of interpretation read into an enactment a more limited policy than that which is clearly projected into action by the words of the lawmakers.

I think the statute in question, *N. J. S. A.* 33 :1–1 *et seq.*, says that *all* wholesalers duly licensed by the Director of Alcoholic Beverage Control have an equal right to purchase the products of distillers operating in New Jersey, and that if they have the financial capacity to pay therefor, they cannot be refused arbitrarily. *Prima facie* all wholesalers must be treated on a parity, and *prima facie* the distillers cannot limit the number with whom they will deal. The impact of the statute under ordinary circumstances is that any reasonably competent and financially capable wholesaler is entitled to be served and cannot be discriminated against arbitrarily. The fact that it would be more convenient or more feasible or more efficient for the distiller to deal with a limited number would not of itself provide an escape from condemnation as arbitrary discrimination. Such is the burden imposed by *N. J. S. A.* 33 :1–1 *et seq.* on this highly regulated industry. Any lessening of that burden must come from the source which imposed it.

Let us look at the statute closely. It was enacted in 1942. *L.* 1942, *c.* 264. It ordains that "[t]here shall be no discrimination in the sale of alcoholic liquors by distillers * * * to duly licensed wholesalers * * *." *Section* 1. Here it should be noted that a wholesaler is defined as "[a]ny person who sells an alcoholic beverage for the purpose of resale either to a licensed wholesaler or to a licensed retailer, or both." *N. J. S. A.* 33:1–1 *subd. z*; also that wholesale licenses are issued by the Director, *N. J. S. A.* 33:1–11; 33:1–18. No limitation on the number appears in the act. Such licensees are "entitled, subject to rules and regulations, to sell and distribute alcoholic beverages to [licensed] retailers and wholesalers." *N. J. S. A.* 33:1–11. Whenever a distiller refuses to sell "to *any* individual wholesaler" *"any"* amount of alcoholic liquor, the Director, on complaint of the wholesaler, is required to determine if the refusal is arbitrary. *L.* 1942, *supra, section* 2. If it is found to be arbitrary and the Director is satisfied that the ability to pay is present, he "shall order" the sale completed. *Section* 3. In the event of failure to comply, the Director must forbid *"every* licensed wholesaler" from purchasing the distiller's products. *Section* 4.

It is difficult to imagine more imperative language. The supervisory administrative machinery may be set in motion by refusal to sell to "any" wholesaler "any" amount of liquor. It is legislating rather than interpreting to read into this section the qualification that the refusal to sell must be to a wholesaler with whom the distiller has been dealing regularly.

Not only do the words used demonstrate the intent of the Legislature to make all licensed wholesalers *prima facie* entitled to purchase from the distillers, but the introducer's statement emphasizes the fact. It says:

"The purpose of this act is to insure an equitable basis for competition between *all* licensed wholesalers of alcoholic beverages in New Jersey and to prevent any monopolistic freezing-out of *one* wholesaler by another by preventing the sale of certain products to him."

It is a matter of common knowledge that in the past various brands of liquor were in shorter supply or greater demand than others. When such a situation exists, if those brands are localized in the hands of one or a few wholesalers, obviously retailers will be more anxious to deal with him or them in order to obtain a supply of the scarce commodity and therefore will be inclined to purchase their other related requirements of alcoholic beverages from him or them to the detriment of the not so favored wholesalers. The Legislature may well have believed that such a situation would produce practices known to be inimical to the public interest. And when it is recalled that in 1942 when the statute was adopted the country was at war and imported liquors were unusually scarce, it is not difficult to conjure up the reason for the legislative desire to secure an equitable basis for competition among *all* wholesalers. If the reason for the adoption of the regulation has disappeared, then the power of the Legislature to give recognition to the change is plenary.

If this is the proper view of the 1942 act, and to me it is inescapable, then the present case must be approached from that standpoint. It is conceded that the excluded wholesalers have sufficient financial capacity to pay for their purchases. There is no substantial evidence in the record to indicate that they are not reasonably competent to engage in the business as wholesalers or that they have not done so. There has been no suggestion of engagement in any improper or proscribed trade practices. No proof was offered of any disparagement of the distiller's products or of unfair preferment in sales efforts for those of a competitor. In the face of the mandate of the statute and the proof adduced, the elimination of these wholesalers must be deemed arbitrarily discriminatory.

In the field of strictly private enterprise such a curtailment of the prerogatives of management might well be invalid. *Great Atlantic & Pacific Tea Co. v. Cream of Wheat Co.*, 227 *F.* 46 (2 *Cir.* 1915). But the liquor business, attended as it is with dangers to the community, must

bow to the heavy and pervasive hand of the police power—
if the Legislature wills it. *Butler Oak Tavern v. Division
of Alcoholic Beverage Control*, 20 *N. J.* 373, 384 (1956);
*Eskridge v. Division of Alcoholic Beverage Control*, 30 *N. J.
Super.* 472 (*App. Div.* 1954).

It has been suggested that the views expressed herein are
incompatible with the decision of this court in *Hoffman v.
Hock*, 8 *N. J.* 397 (1952). I do not think so. There it
was said that the act does not prevent a distiller from acting
as the *exclusive* distributor or wholesaler of its own products.
Accordingly, it would be lawful not to sell through or use
wholesalers *at all;* "thus it is still open to the distiller to
sell directly to retail dealers if licensed so to do." The court
then indicated that it was not violative of the statute for
the distiller to divide the State into two areas, northern
and southern New Jersey, and sell directly to retailers in
the northern area, without the use of *any* wholesalers *at all*
there. But the plain tenor of the opinion is that if any
wholesalers were utilized in the area, discrimination among
them would be illegal. See 8 *N. J.* at *page* 409. In other
words, if one wholesaler were appointed to act, all other
such licensees operating in the area would be entitled *prima
facie* to have their purchase orders filled.

To what extent the doctrine of the *Hock* case can be
refined, that is, whether a distiller can establish a great
many small districts in the State and sell directly in some
and through wholesalers in others, is not an issue now and
need not be discussed, except to say that the act cannot be
circumvented and that presently the *Hock* case is confined
to its own factual situation.

HEHER, J. (concurring in affirmance). I concur in the
affirmance of the determination made by the Director, but
subject to the views expressed by Mr. Justice FRANCIS on
the quality and scope of the particular regulatory provisions
of the statute.

The ban on "discrimination" in the sale of alcoholic
liquors by distillers, importers and rectifiers of nationally

advertised brands to duly licensed wholesalers is peremptory. *L.* 1942, *c.* 264, *N. J. S. A.* 33:1–93.1. A refusal to sell to "any individual wholesaler" or to "comply with the provisions of [the] act" is made reviewable by the Director, "to determine whether such refusal to sell is arbitrary or not." *N. J. S. A.* 33:1–93.2. But if the Director "is satisfied with the ability of the wholesaler to pay for such merchandise as ordered," he "shall order" the distiller, importer or rectifier "to complete said sale of alcoholic liquor to the wholesaler," and in the event of a refusal so to do, the Director shall issue an order to every licensed wholesaler prohibiting the purchase by such wholesaler of any alcoholic liquor products of the offending distiller, importer or rectifier, directly or indirectly, until there is strict compliance with the order. *N. J. S. A.* 33:1–93.3; 33:1–93.4. And the Director is enjoined, *N. J. S. A.* 33:1–93.5, to adopt and promulgate such rules and regulations as may be necessary "to carry out and insure compliance with the provisions of [the] act." But this does not mean, I would suggest, that the Director is thereby empowered to define the statutory "discrimination" in terms of his own unregulated discretion and judgment as to what is reasonable and not arbitrary. He cannot enlarge or detract from the declared policy and rule of action. It is fundamental law that the administrative authority is to be contained by a certain and definite legislative standard. *State Board of Milk Control v. Newark Milk Co.*, 118 *N. J. Eq.* 504 (*E. & A.* 1935). Here, it is "discrimination," without more, that is forbidden by this provision. And the only specific statutory criterion, *N. J. S. A.* 33:1–93.3, is the ability of the wholesaler to pay for the "merchandise as ordered." The policy and purpose of the act measure the significance of particular terms; and the Director is obliged to effectuate the intent of the lawgiver, and not to modify the legislative expression. The rule-making power concerns procedure alone; rules are mechanical aids to the fulfillment of the plan and course of action laid down by the Legislature.

This provision against discrimination, the fruit of long experience, is designed to fulfill the basic statutory policy of temperance and the avoidance of the evils of undue competition, direct and indirect, in a field of business that has its own peculiar perils and is subject to strict regulation for the essential common and individual good. *Paul v. Gloucester County*, 50 *N. J. L.* 585 (*E. & A.* 1888); *Butler Oak Tavern v. Division of Alcoholic Beverage Control*, 20 *N. J.* 373 (1956); *Crowley v. Christensen*, 137 *U. S.* 86, 11 *S. Ct.* 13, 34 *L. Ed.* 620 (1890); *United States v. Frankfort Distilleries*, 324 *U. S.* 293, 300, 65 *S. Ct.* 661, 89 *L. Ed.* 951 (1945). Dealers denied access to "nationally advertised brands" are placed at a competitive disadvantage that could make for untoward consequences in relation to the beneficent policy of the act.

The design of the act, *N. J. S. A.* 33:1–3, to which the particular statute is a supplement, is the supervision by the Director of the "manufacture, distribution and sale of alcoholic beverages in such a manner as to promote temperance and eliminate the racketeer and bootlegger." The chapter is "intended to be remedial of abuses inherent in liquor traffic and shall be liberally construed" to that end. *N. J. S. A.* 33:1–73. And, as pointed out by Justice FRANCIS, the introducer of the measure made known a purpose "to insure an equitable basis for competition between all licensed wholesalers of alcoholic beverages in New Jersey and to prevent any monopolistic freezing-out of one wholesaler by another by preventing the sale of certain products to him." The legislative terms, in their normal usage, express this purpose.

We have no occasion in this setting to determine the essential significance of the "ability to pay" provision. It suffices to say that it is the only explicit standard of action in this regard; and, at all events, it suggests the imperative quality of the rule against discrimination. There is to be no erosion of the principle by illusory distinctions.

In *Hoffman v. Hock*, 8 *N. J.* 397 (1952), the distiller undertook to sell directly to retailers in the northern and

populous sections of New Jersey; and the holding was that it "is still open to the distiller to sell directly to retailers * * *," and "[i]t may, of course, sell indirectly through the medium of duly licensed wholesalers, if it chooses, but in the latter event it may not discriminate between such wholesalers."

Here, the distiller avows a purpose "to achieve a greater share of its potential" in New Jersey, that is to say, to carry on its business through wholesalers who will "push" the sale of its products, and thus to place its sales operation on the level of ordinary business pursuits, a conception alien to the statutory scheme—"company policy" as against state policy.

The distiller's "national sales manager" testified that "several factors" were considered: "* * * our relationship with the five jobbers we proposed to retain"; "their sales executives, their sales personnel and feeling of these people towards our organization; the other competitive brands which they carry," an undue interference with the wholesalers' open business policy consistent with the statutory principle; "the aggressiveness of [the wholesalers'] sales force, the attitude of their executives towards discussions of advertising and sales potential for our brands"; "* * * we picked the wholesalers that we thought we could work best with"; "* * * we didn't feel any one of the eleven [wholesalers] was doing the business they could do in our products."

The Director's conclusion is well founded.

WACHENFELD, J. (dissenting). The majority apparently encountered difficulty in interpreting the statute in question. My difficulty lies in the fact that although they find that Canada Dry exercised absolute good faith and an informed business judgment in determining to reduce the number of its wholesalers, they nevertheless classify the company's decision as arbitrary and discriminatory. This seems entirely inconsistent if an arbitrary act may accurately be

described as one which is non-rational or capricious, proceeding from a judgment untempered by reason or logic.

The majority opinion recites:

"* * * The executives of Canada Dry who testified, repeatedly asserted that the individual selections were the result of a *good faith business decision* and as such could not be viewed as arbitrary. We have no reason to doubt their credibility. * * *" (Emphasis supplied.)

If the credibility of these officials is unquestioned and their selections were the result of a "good faith business decision," then it would seem that there was no "arbitrary discrimination," prohibited by the statute in question.

Canada Dry was justified, on the basis of its success with like schemes in other sections of the country, in concluding that it would be financially advantageous to the company to drop a certain number of distributors. The determination as to which distributors would be retained was not founded on mere whim but, among other things, on Mr. LaPorte's evaluations of the respective sales forces and their aggressiveness, the importance to each distributor of the Canada Dry line in comparison to its sales of other lines, and the attitude of the various executives of the distributors towards plans for increased advertising and expansion of sales of Canada Dry products. The criteria which the appellant's officers used cannot be formulated in figures, but they are, nonetheless, tangible and legitimate. The statute in question was not intended to eliminate entirely the profit motive as a consideration nor was it designed to interfere with honest, reasoned business practice.

I think the wholesaler who charges a violation of the statute should have the burden of proving a *prima facie* case, but here the majority places the burden of proof upon Canada Dry. Thus, the majority decision requires the appellant to prove a negative proposition, namely, that it did *not* act in an arbitrary fashion.

The usual judicial procedure places the burden of proof upon the party who makes an accusation that his rights

have been transgressed. But that burden has been shifted to appellant because, as the majority state, "Canada Dry is in a far better position than the petitioners to know why this action was taken." If applied generally in the realm of civil law, this reasoning would, in many instances, change the current and accepted placement of the burden of proof. And here that burden has not only been shifted to the distiller but the essence of it has been defined as "This standard must be of such a *tangible or objective nature* as will enable the Director to determine from the proofs whether its application to the wholesalers in question could reasonably result in the distinction which a distiller has made." (Emphasis supplied.)

The shift of the burden and the establishment of its quality are supplied by our adjudication, as the statute contains no such provisions. This is perilously close to what ordinarily would be decried as judicial legislation, which we on other occasions have lugubriously deplored.

I would reverse the decision of the Director of the Division of Alcoholic Beverage Control.

FRANCIS, J., concurring in result.

*For affirmance without prejudice*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS and PROCTOR —5.

*For affirmance in toto*—Justice HEHER—1.

*For reversal*—Justice WACHENFELD—1.