704 A.2d 1327

R & R MARKETING, L.L.C., ROYAL DISTRIBUTORS AND IMPORT-
ERS, LTD., INC., AND REITMAN INDUSTRIES, INC., PETI-
TIONERS–APPELLANTS, v. BROWN–FORMAN CORPORA-
TION, RESPONDENT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued November 12, 1997—Decided January 27, 1998.

Before Judges LONG, KLEINER and KIMMELMAN.

*Frederick E. Gerson,* argued the cause for appellants (*D'Alessandro, Jacovino & Gerson,* attorneys; *Mr. Gerson* and *Edward G. D'Alessandro,* on the brief).

*Ross A. Lewin,* argued the cause for respondent (*Jamieson, Moore, Peskin & Spicer,* attorneys; *Mr. Lewin,* of counsel and on the brief; *Michael G. Petrone* and *David F. Swerdlow,* on the brief).

*Analisa Sama Holmes,* argued the cause for amicus curiae New Jersey Department of Law and Public Safety, the New Jersey Division of Alcoholic Beverage Control (*Peter Verniero,* Attorney General; *Ms. Holmes,* Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

KLEINER, J.A.D.

This case of first impression requires us to interpret *N.J.S.A.* 33:1–93.6, New Jersey's wholesaler anti-discrimination statute, as it may affect licensed liquor wholesalers who have been authorized to distribute liquor supplier's products, and who elect to incorporate under the Limited Liability Company Act, *N.J.S.A.* 42:2B–1 *et seq.* (the Act).

To more fully define the parameters of the issues presented on this appeal from a decision of the Director of the Division of Alcoholic Beverage Control, we must first analyze the factual background predating a decision by petitioners Royal Distributors and Importers, LTD., Inc. (Royal), and Reitman Industries, Inc. (Reitman), to form a limited liability company.

For over twenty years Royal and Reitman were wholesalers, each authorized by Brown–Forman Corporation, a wholesale supplier, to distribute its nationally advertised distilled spirits. Neither Royal nor Reitman have a written contract with Brown–Forman. The relationship of each petitioner with Brown–Forman was protected by *N.J.S.A.* 33:1–93.6, which prohibits:

> discrimination in the sale of any nationally advertised brand of alcoholic beverage other than malt alcoholic beverage, by importers, blenders, distillers, rectifiers and wineries, to duly licensed wholesalers of alcoholic beverages who are authorized by such importers, blenders, distillers, rectifiers and wineries to sell such nationally advertised brand in New Jersey.

In the summer of 1993, Royal and Reitman began discussing the possibility of combining their respective businesses. Ultimately, as discussed in greater detail *infra*, those discussions led to the formation of R & R Marketing, L.L.C. (R & R), also a petitioner herein.[1] The major issue that apparently pervaded these discus-

---

[1] Another company, R & W Warehouse and Transportation Co. (R & W), became a part of the limited liability company as of the date of its formation. R & W was engaged solely in providing transportation in the distribution of the products purchased from Brown–Forman and was not itself a licensed liquor wholesaler. R & W was an integral part of the limited liability company as of the date of petitioners' petition and as of the date of the administrative decision

sions was the form or structure of the proposed venture. It seems evidently clear from the record that the corporate representatives and their respective counsel considered the advantages or disadvantages of a partnership, limited liability company, and holding company. Each party weighed tax considerations of the potential prospective structures. Of greater significance to each company, though, was whether a new entity would retain the protection afforded Royal and Reitman under *N.J.S.A.* 33:1–93.6.

In exploring this central issue, Neil Wassner, a Reitman financial consultant, spoke with Charles Sapienza, then-Executive Director of the New Jersey Wine and Spirits Wholesalers Association. From Wassner's notes, it is apparent that Sapienza opined that if there were a "change in control" of a wholesaler, the statutory protection would continue, but if a new entity was established, the new entity would "probably lose" the statutory protection.

After fully exploring their options, both companies concluded that either a partnership or a limited liability company structure provided the "optimum" tax advantages, but that a holding company structure might provide the optimum benefit of preserving the existing franchises and the statutory protection under *N.J.S.A.* 33:1–93.6. Both companies also discussed the issue of whether Royal and Reitman could continue their ownership rights and "sub-job" to the partnership in the event that R & R could not become an authorized wholesaler.

In November 1993, prior to reaching a decision as to the structure of R & R, Reitman's attorney sought an advisory opinion from the Director of the Division of ABC regarding whether the creation of an "operating partnership" would deprive the petitioners of their statutory protection. In a subsequent communication to the Director, counsel also informed the Director of the possibility that petitioners would form a limited liability company. Di-

which prefaces this appeal. At oral argument, however, we were advised that R & W is no longer part of R & R Marketing.

rector John Holl refused to issue an advisory opinion because he believed the same issue could arise as a contested case before the Division in the future.

During the investigatory stage preceding their formation as a limited liability company, petitioners discussed with and obtained the consent from some of their other liquor suppliers regarding the transfer of their wholesaler authorizations to R & R. Petitioners admit that they neither specifically asked for nor received the consent of Brown–Forman to continue to distribute its products.[2]

In July 1994, Royal and Reitman entered into an agreement which created R & R as a limited liability company pursuant to the Act. They executed an Operating Agreement which contained a non-competition clause:

2.7 *Other Business Interests of the Members.* No Member, nor any of their present or future Affiliates, directly or indirectly, by itself or in any other form or combination with any other person or entity, shall, during the term of the Company engage in the wholesale distribution or sale, in, to or from New Jersey, of alcoholic or non-alcoholic beverages or conduct a warehousing business in New Jersey for alcoholic or non-alcoholic beverages. Except as set forth in this Section 2.7, the Members and their Affiliates may engage in or possess interests in other business ventures of every kind and nature and neither the Company nor any other Member shall have any rights by virtue of this Agreement in any such other business ventures of a Member or the income or profits derived therefrom by that Member.

The Operating Agreement contained an exception to the Section 2.7 non-competition clause in the event that a supplier did not consent to Royal's and Reitman's transfer of their wholesaler authorizations to R & R:

4.6 *Distribution and Warehouse Contracts.* All Distribution and Warehouse Contracts between Royal, Reitman or R & W and manufacturers or distributors of alcoholic or non-alcoholic beverages shall, to the extent possible, be transferred and assigned to the Company as the contracting party in the place of Royal, Reitman or R & W. To the extent any such Distribution or Warehouse Contract cannot be transferred or the other party thereto refuses to consent to such transfer, if such consent is necessary, such contract shall remain in the name of Royal, Reitman or

---

[2] The record seems clear that Brown–Forman was made aware of petitioners' intention to form R & R, and that Brown–Forman never expressly disapproved of petitioners' plan, nonetheless, the record is clear that Brown–Forman never expressly sanctioned the formation of R & R.

R & W. In such event, Royal, Reitman or R & W shall purchase beverages from or perform warehousing services for the other party to such contract and sell the same directly to and perform such warehousing services on behalf of the Company at cost so that the Company would be in the same economic position with respect to such contract as it would have been in had such contract been transferred pursuant to this section 4.6. Each Member shall take such action as is necessary or reasonable in order to effect the intent of this Section 4.6.[3]

The term "Distribution Contract" is defined in the Operating Agreement as "all contracts, oral or written, to which Reitman, R & W, Royal or the Company is a party, or any other form of authorization pursuant to which any of them is authorized to distribute or sell alcoholic or non-alcoholic beverages." [4]

Soon after R & R's creation, it attempted to purchase alcoholic beverages from Brown–Forman. However, Brown–Forman refused to fill those orders. On July 20, 1994, petitioners filed a Verified Petition against Brown–Forman seeking protection under *N.J.S.A.* 33:1–93.6 and *N.J.A.C.* 13:2–18.1.

Petitioners simultaneously sought *ad interim* relief mandating Brown–Forman to supply them with certain alcoholic beverages during the pendency of the proceeding. On the same day, the Director granted interim relief to Reitman and Royal, but denied same to R & R. The ruling was confirmed in an order dated July 22, 1994.

---

[3] Petitioners' intent is clarified in an inter-company communication written by Reitman's counsel:

The simplest alternative would be to follow the method of operation described in Section 4.6, described above. Royal and Reitman would each purchase products from the appropriate suppliers and then resell those products to R & R. R & R would then sell the products to its customers through its Reitman division, its Royal division, or any other divisions it may have.

[4] Both Royal and Reitman executed Transfer, Assignment and Assumption Agreements through which they transferred to R & R all of their primary interests in their operating assets, particularly their respective authorizations to sell alcoholic and non-alcoholic beverages. (Assets excepted from these agreements are not pertinent to this appeal.)

Specifically, petitioners argued in their Verified Petition that: (1) *N.J.S.A.* 33:1–93.6 should be liberally construed to protect their interests; (2) their agreements creating R & R conveyed their privileges under the statute; (3) the formation of the limited liability company should be treated like a corporate merger and therefore Reitman's and Royal's authorizations were legally transferred to R & R through the limited liability company's formation.

In its answer, Brown–Forman claimed that R & R was not protected under the statute because it never authorized R & R to sell its brands, and further that Reitman and Royal lost their protections under the statute because they gave up their ability to act as independent wholesalers by forming the limited liability company in the manner that they did.

After full discovery, Brown–Forman successfully moved for summary judgment, and petitioners' verified petition was dismissed. In reaching this decision, the Director concluded that as a matter of law R & R was not an authorized wholesaler under *N.J.S.A.* 33:1–93.6, and thus was not entitled to statutory protection. The Director reasoned that petitioners' interpretation of the pertinent statute could lead to other authorized wholesalers entering into numerous joint ventures to distribute products with or through unauthorized wholesalers. Additionally, the Director concluded that petitioners' interpretation would undermine the goal of the statute to balance the protections afforded wholesalers with the competitive interests of suppliers, stating:

> [*N.J.S.A.* 33:1–93.6] is designed to balance interests. If the interpretation urged by Petitioners is correct, then authorized wholesalers would be able to auction off their "authorized status" to the highest bidders among non-authorized wholesalers.
>
> This interpretation of the statute would lead to chaos, effectively destroying a manufacturer's ability to create a stable distribution network. One of the purposes of the Alcoholic Beverage Law is to promote stability in the marketing of alcoholic beverages, which in turn fosters moderation and responsibility in the use of alcoholic beverages.

He was also concerned that such trade instability would "create a real danger of 'price wars' and other destabilizing practices."

The Director also addressed petitioners' claim that the formation of a limited liability company should be treated like a corporate merger, by which all personal property, tangible and intangible, becomes vested in the new corporation, and all constituent companies cease to exist. *See N.J.S.A.* 14A:10–6(d), (e). He distinguished New Jersey's Corporations Law from the Limited Liability Company Act, which leaves the issue of whether the separate parties to the company may continue to exist largely to the Operating Agreement, and which provides that the newly-formed company is an entity separate from its members.

He further concluded that Royal and Reitman could not retain their individual authorizations to distribute respondent's products because, according to R & R's operating and other agreements, they remained as separate entities only to "front" for R & R:

> The system set up by Royal and Reitman requires them in the first instance to transfer their distribution contracts to R & R. If they are unable to do so, they must purchase [the] product themselves and sell it directly to R & R "at cost" so that R & R achieves the same economic position if [sic] would have been in had the contract been transferred. In short, they have agreed to front for R & R.
>
> Brown–Forman correctly characterizes this as a "sham arrangement." Once Reitman and Royal executed agreements obligating them to front for R & R, they forfeited their protection under the statute.

In addition, the Director dismissed petitioners' estoppel claim, finding that they did not show that they relied upon Brown–Forman's conduct to their detriment. He concluded that petitioners predicated their decision to form a limited liability company not on franchise concerns but rather on the extent of the tax benefits.

Petitioners appeal from the Director's decision. We reverse.

I

Generally, on appeal from an administrative decision, we will not upset the ultimate determination of an agency unless it was arbitrary, capricious or unreasonable, or violated legislative policies expressed or implied in the act governing the agency. *Campbell v. Dep't of Civil Serv.,* 39 *N.J.* 556, 562, 189 *A.*2d 712

(1963). When an error in a factfinding of an administrative agency is alleged, the court gives "due regard" to the ability of the factfinder to judge credibility and, where an agency's expertise is a factor, to that expertise. *Close v. Kordulak Bros.*, 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965).

■ When asked to review an agency's interpretation of a statute or strictly legal decision, we respect the agency's expertise. *Mayflower Sec. Co., Inc. v. Bureau of Sec.*, 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973). Ultimately, though, interpretation of statutes is a judicial, not an administrative, function, and the court is not bound by the agency's interpretation. *Ibid.*

II

The Director's interpretation of *N.J.S.A.* 33:1–93.6, a law he was charged with safeguarding, is obviously entitled to deference based upon his expertise. However, he concluded as a matter of law that petitioners were not entitled to protection under the statute. This court is not bound by the Director's conclusions of law. Moreover, although his ultimate findings affected petitioners' rights under *N.J.S.A.* 33:1–93.6, the Director's conclusions were also based on his interpretation of the Limited Liability Company Act, a statute of relatively recent origin which the Director is not charged in safeguarding. As a result, this court is not bound by the Director's finding that a limited liability company formed by two authorized wholesalers is not entitled to protection under *N.J.S.A.* 33:1–93.6 because the company itself is not an authorized wholesaler.

III

■ The Limited Liability Company Act was enacted in 1994. Section 42:2B–8(b) of the Act provides that:

A limited liability company shall possess and may exercise all the powers and privileges granted by this act or by any other law or by its operating agreement, together with any powers incidental thereto, so far as such powers and privileges

are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the limited liability company.

Under the Act, a "member" of a limited liability company acquires a "limited liability company interest," which is defined as "a member's share of the profits and losses of a limited liability company and a member's right to receive distributions of the limited liability company's assets." *N.J.S.A.* 42:2B-21; *see also N.J.S.A.* 42:2B-2 (defining "limited liability company interest").

The Act "is to be liberally construed to give the maximum effect to the principal of freedom of contract and to the enforceability of operating agreements." *N.J.S.A.* 42:2B-66; *see also* Peter D. Hutcheon, *The New Jersey Limited Liability Company Statute: Background and Concepts,* 18 *Seton Hall Legis. J.* 111, 129 (1993) ("[Section] 8(b) does invest private parties with quasi law-making power, by expressly endorsing the concept of private ordering as a source of common law."). Further, Section 42:2B-67 provides that "[i]n any case not provided for in this act, the rules of law and equity, including the law merchant, shall govern."

In enacting the Act, the Legislature obviously sought to encourage capital investment within the State by encouraging the formation of limited liability companies. Although parties forming a limited liability company under the LLC are given somewhat wide latitude in structuring their organizations through operating agreements, they may not circumvent the mandates of other statutes, such as *N.J.S.A.* 33:1-93.6. *See N.J.S.A.* 42:2B-67. This court must therefore consider New Jersey's interest in promoting the formation of limited liability companies together with the remedial purposes behind the *N.J.S.A.* 33:1-93.6.

New Jersey's anti-discrimination statute, *N.J.S.A.* 33:1-93.6, and its corresponding administrative regulation, *N.J.A.C.* 13:2-18, have been construed as designed for "the protection of the public through the promotion of temperance and elimination of the racketeer and bootlegger." *Canada Dry Ginger Ale, Inc. v. F & A Distrib. Co.,* 28 N.J. 444, 455, 147 A.2d 15 (1958). "[T]he statute seeks to achieve as far as necessary the independence of wholesal-

ers from distillers[,] ... and ... to prevent the distiller from arbitrarily closing the source of supply to a wholesaler." *Ibid.* The statute and the Director's authority to enforce it shall be liberally construed. *Ibid.*

The effect of the law is to prevent alcohol suppliers from arbitrarily terminating their relationships with wholesalers. Further, according to the Attorney General, the law is to secure equitable competition among wholesalers. Originally, it applied to all wholesalers. In 1966, the Act limited its scope to "duly licensed wholesalers of alcoholic beverages who are *authorized*" by the manufacturers or suppliers. *N.J.S.A.* 33:1–93.6 (emphasis added). While the statute offers expansive protection to "authorized" wholesalers, *see American B.D. Co. v. The House of Seagrams, Inc.,* 107 *N.J.Super.* 264, 267, 258 *A.*2d 129 (App.Div.1969), it does not define the exact method or criteria upon which a licensed wholesaler becomes an "authorized" wholesaler.

The crux of the Director's decision seems predicated on the fact that although both Royal and Reitman are separately authorized wholesalers, their newly-formed limited liability corporation is technically not an authorized wholesaler. Yet, as petitioners argue, had Royal and Reitman effectuated a corporate merger the new corporate entity would have preserved their authorized wholesaler status. *N.J.S.A.* 14A:10–6.[5]

Because both *N.J.S.A.* 33:1–93.6 and the Limited Liability Company Act are to be liberally construed, affording petitioners protection under *N.J.S.A.* 33:1–93.6 would not defeat the purpose of that statute but would advance New Jersey's goal in promoting the formation of limited liability companies as expressed in the Limited Liability Company Act. The essential relationship between Brown–Forman and R & R has not changed by combining

---

[5] Under *N.J.S.A.* 14A:10–6(b), upon the completion of a corporate merger, "[t]he separate existence of all parties to the plan of merger or consolidation ... shall cease." The surviving corporation thus succeeds to "all the rights, privileges, powers, immunities, purposes and franchises, both public and private" of the merging corporations. *N.J.S.A.* 14A:10–6(c).

the individual corporate entities under the umbrella of a limited liability company.

In *Joseph H. Reinfeld, Inc. v. Schieffelin & Co.*, 94 *N.J.* 400, 466 *A.*2d 563 (1983), the Court held that where only the supplier's state of incorporation changes, it cannot avoid the anti-discrimination statute. *Id.* at 409, 466 *A.*2d 563. In *Reinfeld*, the supplier terminated all of its wholesalers and went out of business; the "new" supplier authorized only one wholesaler to distribute its products. *Id.* at 408, 466 *A.*2d 563. However, the "old" and "new" supplier "had the same directors, officers and salespeople. Only the state of incorporation changed." *Id.* at 409, 466 *A.*2d 563. The Court held that were it to allow the supplier "to avoid the anti-discrimination statute through such corporate legerdemain, [it] would plainly frustrate the statute's purpose." *Ibid.See also Royal Liquor v. Brown–Forman*, 4 *N.J.A.R.* 248 (1982) (holding that a supplier that undergoes a corporate reorganization may not terminate the authorizations of wholesalers previously authorized to distribute its brands).

R & R was formed by two authorized wholesalers who transferred their authorizations via their operating, transfer and assignment agreements to R & R. Petitioners maintain that both Royal and Reitman are in complete control of their respective sales forces. Further, petitioners state that the same officers that were in control of Brown–Forman's account with each petitioner prior to the joint venture would be in control of the joint venture. As a result, the relationships between Royal and Brown–Forman and Reitman and Brown–Forman arguably did not change. Actually, the business conducted between them may have been simply made more efficient by the formation of R & R. Interests of equity thus may dictate that R & R be afforded protection under *N.J.S.A.* 33:1–93.6. *See N.J.S.A.* 42:2B–67.

In response to petitioners' arguments, Brown–Forman, citing *Reinfeld* and *Royal Liquor* argues: "Just as the protections granted wholesalers by the statute cannot be artificially constrained by a supplier's corporate transactions, so too wholesalers

may not employ corporate gimmickry in order to artificially expand the group of wholesalers authorized to sell a supplier's products." Although that argument has facial appeal, its persuasiveness pales when two authorized wholesalers combine under a newly-formed corporate structure.

More important, this is not a case where an authorized wholesaler and an unauthorized wholesaler seek protection under *N.J.S.A.* 33:1–93.6 for a newly-formed corporate entity. The Director's concerns seem more applicable to those instances where an authorized wholesaler seeks to combine its business with the business of an unauthorized wholesaler, thereby circumventing the limitations imposed by the anti-discrimination statute as amended in 1966. In such a case, a decision by a supplier to refuse to sell to the newly-formed entity may indeed be legitimate and not discriminatory. Moreover, approval of a wholesaler is the prerogative of the supplier who has the right to select its own distribution network.

However, as noted, where the new entity is composed of previously approved wholesalers, the supplier's control of its distribution system is not dissipated. It is quite apparent that the Director elevated form over substance in this particular case. As such, his decision was arbitrary and unreasonable. *See Campbell, supra,* 39 *N.J.* at 562, 189 *A.*2d 712. Although "[a] limited liability company formed under the act shall be a separate legal entity," *N.J.S.A.* 42:2B–11(b), nonetheless, we cannot overlook the fact that the new separate legal entity is composed of two entities which previously were authorized wholesalers and entitled to the benefits of the anti-discrimination provisions and policies embodied in *N.J.S.A.* 33:1–93.6.

We recognize that at its inception, R & R was comprised of Royal, Reitman, and R & W Warehouse and Transportation Co., a business clearly not engaged in wholesaling of alcoholic beverages, but engaged in transportation. The State in its amicus curiae brief, in fact, argues that "R & R is not solely made up of authorized wholesalers and thus [is] not entitled to the statuary protection." We find that argument unpersuasive, as R & W's

participation in the limited liability company as a deliverer does not expand the class of authorized wholesalers protected by *N.J.S.A.* 33:1–93.6. Whether an authorized wholesaler utilizes its own employees or an outside company to deliver its products seems irrelevant absent evidence that the use of a delivery service in some manner interferes with the intended function of the distribution system.[6]

Because we have concluded that the Director erred in reaching his decision, it is not necessary to consider petitioners' other contentions that Royal and Reitman could continue to operate independently within the framework of R & R's Operating Agreement, section 4.6, or that Brown–Forman should be estopped from refusing to recognize R & R as an authorized wholesaler. Our decision renders each of those arguments moot.

The decision of the Director denying the protections of the anti-discrimination statute, *N.J.S.A.* 33:1–93, to petitioners is reversed.

---

[6] As noted *supra,* note 1, we were advised at oral argument that R & W is no longer a part of R & R.