729 A.2d 1

R & R MARKETING, L.L.C.; ROYAL DISTRIBUTORS AND IM-
PORTERS, LTD., INC., AND REITMAN INDUSTRIES, INC.,
PETITIONERS–RESPONDENTS, v. BROWN–FORMAN CORPO-
RATION, RESPONDENT–APPELLANT.

Argued February 1, 1999—Decided April 22, 1999.

Ross A. Lewin, argued the cause for appellant Brown–Forman Corporation (Jamieson, Moore, Peskin & Spicer, attorneys).

David N. Bregenzer, Jr., Deputy Attorney General, argued the cause for appellant New Jersey Division of Alcoholic Beverage Control (Peter Verniero, Attorney General of New Jersey, attorney).

Edward G. D'Alessandro, argued the cause for respondents (D'Alessandro, Jacovino & Gerson, attorneys; Mr. D'Alessandro and Frederick E. Gerson, on the brief).

The opinion of the Court was delivered by

O'HERN, J.

This appeal concerns the right of two wholesale distributors of alcoholic beverages to assign their existing franchise rights to distribute certain brands of alcoholic beverages to a wholly-owned limited liability company (LLC). The founding members of the LLC sought as well to retain the franchise rights to themselves. The Director of the Division of Alcoholic Beverage Control (Director and ABC) ruled that the restructuring was an attempt by the two wholesalers to force their suppliers to distribute through an unauthorized wholesaler, thereby causing the two wholesalers to lose their franchise rights protected by the anti-discrimination law. The anti-discrimination law provides:

> There shall be no discrimination in the sale of any nationally advertised brand of alcoholic beverage other than malt alcoholic beverage, by importers, blenders, distillers, rectifiers and wineries, to duly licensed wholesalers of alcoholic beverages who are authorized by such importers, blenders, distillers, rectifiers and wineries to sell such nationally advertised brand in New Jersey.

> [N.J.S.A. 33:1–93.6]

On appeal, the Appellate Division found that the transaction was in substance, if not form, a merger that should not cause the two wholesalers to lose their franchise rights. 307 N.J.Super. 474, 704

*A.2d* 1327 (App.Div.1998). Because one of the founding members of the LLC has since acquired the other, we remand the matter to the Director to reconsider the status of the parties and to adopt rules or other suitable guidelines for future restructurings in the alcoholic beverage industry.

I

This is our understanding of the facts. Reitman Industries, Inc. (Reitman) and Royal Distributors and Importers, Ltd., Inc. (Royal) sought to combine their business operations. Each had been authorized to distribute certain products sold by respondent Brown–Forman. Reitman's operations were centered in North Jersey, while Royal's operations were in South Jersey. Both companies distribute alcoholic beverages for various suppliers, including Brown–Forman. Reitman was authorized by Brown–Forman to distribute fourteen specific brands, while Royal was authorized to distribute five brands.[1]

Under the anti-discrimination law, once a supplier authorizes sales of a nationally advertised brand by a wholesaler, the wholesaler is entitled to continue to distribute the product absent exceptional circumstances. These authorizations are granted on a product-by-product basis and are then reflected on a brand registration schedule that each supplier must file with the ABC for each product. Suppliers sometimes authorize a single wholesaler to handle a product, creating an exclusive distributorship within the State. In other instances, suppliers grant multiple authorizations to competing wholesalers.

---

[1] For over thirty years, Reitman had been authorized by Brown–Forman to distribute certain nationally advertised brands of alcoholic beverages including: Early Times Whiskey; Canadian Mist; Southern Comfort; Jack Daniels; Southern Comfort Cocktails; Korbel Champagne; Bolla Wines; Noilly Pratt Vermouth; Sempe Armagnac; Pepe Lopez Tequila; Bush Mills Malt Whiskey; Black Bush Whiskey; Fontana Fredda Wine; and Pepe Lopez Triple Sec. For over twenty-three years, Royal had been authorized by Brown–Forman to distribute: Southern Comfort; Southern Comfort Cocktails; Crystal Comfort; Bushmills Irish Whiskey; and Glenn Morangie Single Malt Scotch.

We are informed that the majority of the two wholesalers' relationships with suppliers, including Brown–Forman, are not protected by written contracts. The parties therefore attempted to determine which structure for their business combination would afford them the best chance of preserving their protections under the anti-discrimination law. Due to potential tax consequences the parties rejected a corporate merger and decided to establish a new entity, a limited liability company, a form of business organization recently authorized by the New Jersey State Legislature.

Under the agreement, Reitman and Royal would each transfer their operating assets to the new entity, R & R Marketing, L.L.C. (R & R), and in return obtain an ownership interest in R & R. The founding corporations were to maintain a separate existence, while agreeing to refrain from competition with R & R. Reitman and Royal first sought to transfer their supplier authorizations to the new entity with the consent of the supplier, if necessary. In the alternative, Reitman and Royal agreed that they would purchase the alcoholic beverages required by R & R, and transfer those beverages to R & R at cost. After the business combination commenced operations on July 1, 1994, Brown–Forman refused to honor orders placed by the companies.

The companies sought protection from the Director pursuant to *N.J.S.A.* 33:1–93.6, and requested interim relief compelling sales by Brown–Forman pending his deposition. Interim relief was granted as to Royal and Reitman, but not as to R & R. After reviewing the submissions, the Director found that the statute affords no protection to a New Jersey wholesaler until a manufacturer has designated it as an authorized distributor. The Director reasoned that the objectives of the law do not include forcing a distiller to distribute its products to unauthorized wholesalers. Although he recognized that the anti-discrimination law is to be liberally construed, the Director characterized the plan to transfer products to R & R at cost a "sham agreement." He concluded that "[o]nce Reitman and Royal executed agreements obligating them to front for R & R, they forfeited their protection under the

statute." On the question of whether the formation of the LLC was a *de facto* merger, the Director reasoned that the distinguishing characteristic of a merger is that the acquired entity ceases to exist. That did not occur here.

On appeal, the Appellate Division ruled "that the Director elevated form over substance." 307 *N.J.Super.* at 486, 704 *A.*2d 1327. The court observed that "[t]he crux of the Director's decision seems predicated on the fact that although both Royal and Reitman are separately authorized wholesalers, their newly-formed limited liability corporation is technically not an authorized wholesaler." *Id.* at 484, 704 *A.*2d 1327. The court reasoned that "where the new entity is composed of previously approved wholesalers, the supplier's control of its distribution system is not dissipated." *Id.* at 486, 704 *A.*2d 1327. We granted the petitions for certification of Brown–Forman and the Director. 156 *N.J.* 384, 718 *A.*2d 1213 (1998).

II

The judicial capacity to review an administrative agency's decision is limited. *Public Serv. Elec. and Gas Co. v. State Dep't of Envtl. Protect.*, 101 *N.J.* 95, 103, 501 *A.*2d 125 (1985). Courts generally "give substantial deference to the interpretation an agency gives to a statute that the agency is charged with enforcing." *Smith v. Director, Div. of Taxation*, 108 *N.J.* 19, 25, 527 *A.*2d 843 (1987). Although sometimes described as a search for arbitrary or unreasonable agency action, the judicial role is restricted to three inquiries: (1) whether the agency's action violates express or implied legislative policies; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors. *Public Serv. Elec. and Gas Co., supra*, 101 *N.J.* at 103, 501 *A.*2d 125.

Because the power to regulate the sale of intoxicating liquors is "practically limitless," *Joseph H. Reinfeld, Inc. v. Schieffelin & Co.,* 94 *N.J.* 400, 412, 466 *A.*2d 563 (1983), we would hesitate to substitute our judgment for the agency's own policy determinations concerning regulation of the alcoholic beverage industry. And because the facts are not so much in dispute as are the conclusions to be drawn therefrom, our focus is on the second prong of the test for agency review: whether denying the protection of the anti-discrimination law to the newly formed LLC conflicts with or is consistent with legislative policies.

The legislative policies that undergird the anti-discrimination law were set forth in *Reinfeld, supra.* The Court noted that "[t]he purpose of this bill is to ensure an equitable basis for competition between supplier franchised wholesalers of alcoholic beverages in New Jersey." *Id.* at 408, 466 *A.*2d 563. The Court explained further:

> The ultimate goal sought to be attained by the statute in question, as in the entire scheme of liquor legislation, is the protection of the public through the promotion of temperance and elimination of the racketeer and bootlegger. *N.J.S.A.* 33:1-3. In order to accomplish this purpose the statute seeks to achieve as far as necessary the independence of wholesalers from distillers.... For the purpose of strengthening the wholesaler's resistance if confronted with a distiller's wish to over-stimulate sales and thus negate the public policy in favor of temperance or a desire to engage in other prohibited acts, e.g., tie-in-sales, the statute seeks to prevent the distiller from arbitrarily closing the source of supply to a wholesaler.
>
> [*Ibid.* (citing *Canada Dry Ginger Ale, Inc. v. F. & A. Distributing Co.,* 28 *N.J.* 444, 455, 147 *A.*2d 15 (1958) (examining the predecessor to the anti-discrimination statute)).]

It is not so easy to reconcile the promotion of temperance with the parallel goal of consumerism that is reflected in recent deregulation of the alcoholic beverages industry. *See Heir v. Degnan,* 82 *N.J.* 109, 411 *A.*2d 194 (1980) (sustaining regulations that substantially expanded competition in pricing for alcoholic beverages). Economics of scale that may reduce the cost of alcoholic beverages might have the effect of increasing consumption, not promoting temperance. Nonetheless, it is in this subtle and difficult area that we are most inclined to defer to the Director: would recogni-

tion of protected rights for R & R conflict with the legislative policies that undergird our alcoholic beverage control laws?

## III

As we understand the basic policy of the anti-discrimination law, it is designed to protect against arbitrary action by suppliers, not to enhance existing rights of wholesalers. The law creates no new property rights in wholesalers; it protects existing rights. Brown–Forman argues that as a supplier it retained the right to choose to whom it wanted to distribute its product and where, and that the Appellate Division decision materially altered its distribution network. That decision would permit wholesalers to subdivide their franchise rights and create a multiplicity of wholesalers, when the supplier had intended that there be only one. The Director agrees. He found that the form of the enterprise chosen by the wholesalers constituted an attempt to force Brown–Forman to distribute to an unauthorized wholesaler.

Brown–Forman argues that the Appellate Division misperceived the purposes of the anti-discrimination law and the economics of the industry. The Appellate Division assumed that the restructuring would not affect Brown–Forman's distribution system. The court reasoned that "where the new entity is composed of previously approved wholesalers, the suppliers' control of its distribution is not dissipated." 307 *N.J.Super.* at 486, 704 *A*.2d 1327. Not so, insists Brown–Forman, because the "previously approved wholesalers" did not have parallel rights.[2] In effect, the restructuring would move the authorizations Brown–Forman had limited to North Jersey to South Jersey, and conversely to move to North Jersey authorizations that were limited to South Jersey. For example, Reitman, whose operations are centered in northern New Jersey, was authorized to distribute Jack Daniels, one of Brown–Forman's premier products; however, Royal, whose opera-

---

[2] Of the sixteen Brown–Forman products previously distributed by Royal or Reitman, only one was distributed by both wholesalers, Southern Comfort.

tions are centered in southern New Jersey, was not designated as a distributer of Jack Daniels. Brown–Forman has designated Fedway Associates Inc. to distribute Jack Daniels in South Jersey.

At oral argument, we considered the fact that nominally Reitman's franchise to distribute Jack Daniels was not limited to North Jersey. There were a number of strategies that Reitman could have chosen to penetrate the South Jersey market. It could have hired additional sales people and had them fan out over the southern part of the State to sell Jack Daniels. Conversely, Royal might have done the same with its authorized products. We can agree that at some point a wholesaler might metamorphose into something other than that which the supplier had franchised. At that point, it might not be arbitrary to refuse to continue to supply the wholesaler that had materially altered its authorization. To take another example, a supplier might choose to authorize a tiny wholesaler in Sussex County to serve that market for its product. If that tiny wholesaler were to become a monster of a wholesaler that starts to spread its efforts throughout the State, a supplier might justly feel that its distribution network had been altered.

■ None of these economic issues have been clarified in this record. Is an authorization to distribute in New Jersey to be understood as an authorization to distribute throughout the entire state or an authorization to distribute in the then-existing territory of the distributor? Were Reitman or Royal about to do something under the R & R formation that they could not have done under their existing franchises?

Although administrative agencies are entitled to discretion in making decisions, that discretion is not unbounded and must be exercised in a manner that will facilitate judicial review. Administrative agencies must "articulate the standards and principles that govern their discretionary decisions in as much detail as possible." *Van Holten Group v. Elizabethtown Water Co.,* 121 *N.J.* 48, 67, 577 *A.*2d 829 (1990). When the absence of particular findings hinders or detracts from effective appellate review, the court may remand the matter to the agency for a clearer statement of findings and later reconsideration. *Application of Howard Sav. Inst.,* 32 *N.J.* 29, 53, 159 *A.*2d 113 (1960).

[*In re Vey,* 124 *N.J.* 534, 543–44, 591 *A.*2d 1333 (1991).]

We do so here. Specifically, the agency should "relate its findings in this case to the statutory [policies]" of the anti-discrimination law. *Id.* at 536, 591 *A.*2d 1333. It should articulate the reasoning why the anti-discrimination law does or does not protect R & R's interests in this situation. As noted, Reitman has acquired Royal and we shall assume that under existing law Reitman would be entitled to retain the scope of protection previously afforded to Royal under the anti-discrimination law. Any further disputes between the parties should be resolved by the Director.

## IV

The circumstances of this case suggest that the Division should provide future guidance concerning policies that will apply to such transactions. "Administrative agencies have wide discretion in selecting the means to fulfill the duties that the Legislature delegated to them[;][a]gencies may act informally ... or formally through rulemaking or adjudication in administrative hearings." *Texter v. Department of Human Servs.*, 88 *N.J.* 376, 383–84, 443 *A.*2d 178 (1982) (internal citations omitted). Ordinarily, when the "subject matter of an agency determination concerns matters that transcend those of individual litigants and involves matters of general administrative policy, [the agency's] rule-making procedures should be invoked." *Board of Educ., Plainfield v. Cooperman*, 209 *N.J.Super.* 174, 204, 507 *A.*2d 253 (App.Div.1986), *mod. on other grounds*, 105 *N.J.* 587, 523 *A.*2d 655 (1987) (approving policy guidelines dealing with treatment of AIDS-infected children in schools because public comment was allowed). "There is no catechism that mandates that agency action be one or the other in any given situation." *State, Dept. of Envtl. Protection v. Stavola*, 103 *N.J.* 425, 442–43, 511 *A.*2d 622 (1986) (Handler, J., dissenting). The agency's action may be a "hybrid, partaking of elements from both rule-making and adjudicatory modes." *Id.* at 443, 511 *A.*2d 622 (Handler J., dissenting).

A point to be clarified concerns the scope of distributorship rights. Does an authorization to distribute in New Jersey carry a blanket authorization to distribute anywhere in the State, or is the

authorization to be understood by custom and business practices to be limited to that area that was reasonably within the contemplation of the parties? Another matter to be clarified is what form of reorganization will be contrary to the policies of the anti-discrimination law. For example, would the use of the LLC have been appropriate if the authorizations were understood to be limited in scope before the restructuring? Or put another way, what circumstances will justify a conclusion that, because of a change in the business operations, a wholesaler has materially deviated from its authorization? We leave to the agency the choice of the appropriate procedures to elucidate its administrative policy.

In sum, we agree with the Appellate Division that it is not the form of the transaction that should govern a wholesaler's right to restructure its organization. Rather it is the economic reality of the restructured organization that will determine a wholesaler's rights under the anti-discrimination law. In this case, review of the Director's policy implementation will depend on his analysis of the economic effect of the restructuring of the enterprises. Did the restructuring materially alter the distribution rights previously granted by the supplier? For the future, the Director should provide guidance through regulation, directive or policy statement that will enable parties to shape their transactions to the law's policies.

The judgment of the Appellate Division is reversed and the matter remanded to the Director for any further proceedings concerning the present structure of the enterprise. Pending further action by the Director concerning the present status of the enterprise, the rights of the parties shall remain subject to the same conditions as were implemented under the Director's July 22, 1994 stay order.

*For reversal and remandment*—Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—6.

*Opposed*—None.