81 N.J. Super. 97 (1963)
194 A.2d 749
JAMES M. McCUNN & CO., INC., A CORPORATION, APPELLANT,
v.
FLEMING & McCAIG, INC., A CORPORATION, AND DIVISION OF ALCOHOLIC BEVERAGE CONTROL OF THE STATE OF NEW JERSEY, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 30, 1963.
Decided November 6, 1963.
*98 Before Judges CONFORD, FREUND and SULLIVAN.
Mr. Joseph M. Jacobs argued the cause for appellant (Messrs. Harrison & Jacobs, attorneys).
*99 Mr. Max Mehler argued the cause for respondent, Fleming & McCaig, Inc.
Mr. Avrom J. Gold, Deputy Attorney general, argued the cause for respondent, Division of Alcoholic Beverage Control (Mr. Arthur J. Sills, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by SULLIVAN, J.A.D.
James M. McCunn & Co., Inc. (McCunn) appeals from the conclusions and order of the Acting Director of the Division of Alcoholic Beverage Control, requiring McCunn to sell and continue to sell to Fleming & McCaig, Inc. (McCaig) alcoholic beverages "on terms usually and normally required" by McCunn.
McCunn is an importer of alcoholic beverages and is the sole distributor in the United States of John Begg Scotch whiskey and Tanqueray gin. McCaig has been a liquor wholesaler in New Jersey for more than 25 years.
It has been McCunn's policy to effect distribution in New Jersey through one wholesaler as the sole distributor. McCaig became the sole distributor for McCunn in 1947 and continued in that capacity until 1952 when by mutual agreement John Barry, who had been McCaig's sales manager, took over the prime distributorship for McCunn. However, McCaig continued to sell McCunn's products as subdealer by purchasing from Barry at an "override" of $1.50 per case.
In the spring of 1961 Barry decided to retire from the business as a wholesaler and offered to sell his accounts to McCaig for $15,000. Discussions were had with McCunn who was willing to appoint McCaig as prime distributor in place of Barry if agreement could be reached as to a purchase commitment by McCaig. Ultimately such an agreement was worked out. Effective June 30, 1961, McCaig purchased Barry's accounts for $15,000 and also bought Barry's inventory of 1,200 cases of Begg Scotch. McCaig also agreed to purchase from McCunn an additional 6,800 cases of Begg *100 Scotch and 1,000 cases of Tanqueray gin for the period July 1, 1961-March 31, 1962. McCunn thereupon wrote to the Alcoholic Beverage Control Board of New Jersey notifying it that as of July 1, 1961, it had appointed McCaig as its primary distributor in New Jersey for Begg Scotch and Tanqueray gin.
In addition to effecting distribution in New Jersey through one wholesaler as the prime distributor, it had also been McCunn's policy to enter into a yearly agreement with its prime distributor for the fiscal year April 1 to March 31, whereby the prime distributor committed itself to the purchase of fixed quantities of McCunn's products. Pursuant to such policy Barry had purchased 7,330 cases of Begg Scotch for the fiscal year April 1, 1959 to March 31, 1960, and had purchased 8,655 cases of Begg Scotch for the following fiscal year.
As heretofore noted, when Barry sold to McCaig effective June 30, 1961, he still had in inventory 1,200 cases of Begg Scotch.
On March 1, 1962 McCaig notified McCunn that it still had 5,200 cases of Begg Scotch on hand and would be unable to make any commitment at that time for additional purchases of Begg Scotch for the ensuing year. McCaig, however, indicated its desire to remain as prime distributor.
In May 1962 McCaig was notified by McCunn that the prime distributorship would be terminated as of August 1, 1962. On July 16, 1962 McCunn notified the Division that Joseph H. Reinfeld, Inc., and Majestic Wine & Spirits Corporation (two affiliated wholesalers, the former also being owner of a 35% interest in McCunn) had been appointed as McCunn's prime distributors. Thereafter McCunn refused to do business with McCaig or fill its purchase orders.
In August 1962 McCaig filed a petition with the Director of Alcoholic Beverage Control to require McCunn to continue to fill McCaig's orders. The petition sought relief under N.J.S.A. 33:1-93.1 et seq., the provisions of which are as follows.
*101 "There shall be no discrimination in the sale of alcoholic liquors by distillers, importers, and rectifiers of nationally advertised brands of alcoholic liquors to duly licensed wholesalers of alcoholic liquors in this State.
In the event any distiller, importer, or rectifier shall refuse to sell to any individual wholesaler any amount of alcoholic liquor or comply with the provisions of this act, then the wholesaler shall petition the Commissioner of Alcoholic Beverage Control setting forth the facts and demanding a hearing thereon to determine whether such refusal to sell is arbitrary or not.
If the Commissioner of Alcoholic Beverage Control is satisfied with the ability of the wholesaler to pay for such merchandise as ordered, he shall order the distiller, importer, or rectifier to complete said sale of alcoholic liquor to the wholesaler."
At the hearing on the petition McCaig produced testimony that it sells numerous brands of alcoholic beverages and that many of its customers purchase not only Begg Scotch and Tanqueray gin but also other brands. The inability of McCaig to furnish its customers with Begg or Tanqueray would cause many customers to drop McCaig entirely and purchase from a wholesaler who could supply all their needs. McCaig also charged that its purchase of Barry's accounts for $15,000 was predicated on McCunn's assurances that it would continue McCaig as prime distributor.
At the hearing McCaig also claimed that its 8,000-case commitment for the period July 1, 1961 to March 31, 1962 was a compromise of a 10,000-case figure suggested by McCunn and that there were misgivings at the time as to whether the market could absorb this amount of Begg Scotch since the compromise figure represented a one-third increase over and above the best depletion previously experienced.
McCaig showed that it had been unable to hold on to all of the Barry accounts, many of whom stopped doing business on Begg. It also produced as a witness Barry, who testified that in anticipation of going out of business on July 1, 1961, he had asked his customers to purchase a two or three months' supply and had been fairly successful in his efforts. As heretofore noted, Barry still had 1,200 cases of Begg Scotch on hand on June 30, 1961.
*102 McCunn, on its part, claimed that McCaig readily agreed to the 8,000-case figure and gave assurances that it would have no trouble selling 8,000 cases and most likely would sell more.
It was McCunn's position that the dropping of McCaig as its prime distributor was a sound business decision based upon McCaig's failure to show adequate sales performance of Begg Scotch. McCunn claimed that the 8,000-case commitment by McCaig was a reasonable figure in the light of previous sales under Barry's distributorship, and that McCaig's inability to sell more than it had up to March 1, 1962, justified the decision.
McCunn also contended that its relationship with McCaig was contractual and covered a period expiring March 31, 1962. McCunn argued that a wholesaler whose authorization as a distributor was reduced to a writing fixing a length of time for the duration thereof could not assert any claim under N.J.S.A. 33:1-93.1 et seq.
The Division of Alcoholic Beverage Control concluded that the mere termination of the contract between McCunn and McCaig did not give McCunn the right to terminate its relationship with McCaig and to undertake a new relationship with other distributors. The Division also found it unnecessary to decide whether, under the statute, all wholesalers have an equal right to purchase the products of the distillers. It noted that the overriding consideration and perhaps sole reason why McCunn terminated the distributorship of McCaig was because McCaig did not adequately meet McCunn's sales' goal of purchasing and distributing 8,000 cases of Begg Scotch. The Division added that it might well be that an annual commitment may be a reasonable requirement, provided it does not impose any arbitrary standard. After reviewing all of the proofs, the Division ruled that McCunn had not established any objective criteria which would justify its refusal to continue McCaig as a distributor. The Division's conclusion was that McCunn's refusal to sell was arbitrary within the meaning of the statute. Accordingly, the order which is the basis of the instant appeal was entered.
*103 The Division's reference to "objective criteria" is taken from Canada Dry Ginger Ale, Inc. v. F. & A. Distrib. Co., 28 N.J. 444, 457 (1958). In that case a distiller determined to reduce the number of its New Jersey wholesalers from 11 to 5 and, accordingly, 6 wholesalers were eliminated. A petition was filed under N.J.S.A. 33:1-93.1 et seq. by some of the wholesalers who had been dropped. The Supreme Court held that where it is shown that a distiller or importer has eliminated a wholesaler while continuing to sell to other wholesalers it is reasonable to require the distiller to come forward with an explanation and factual statement so that the Director may effectively fulfill his statutory duty and determine whether the refusal to sell was the result of a decision fairly arrived at, or was arbitrary within the statutory prohibition. It held that while the Director is not authorized to command a distiller to distribute his product to every wholesaler who desires to purchase it, the Director is empowered to determine whether a reasonable method has been employed by a distiller in the selection of wholesalers with whom he will or will not deal. The court added that there must be a showing that the selection of certain wholesalers to the exclusion of others was made on the basis of a standard reasonably related to the legitimate business goal sought to be achieved and not conducive to the evils which the act is designed to prevent. The standard must be of such a tangible or objective nature as will enable the Director to determine from the proofs whether its application to the wholesalers in question could reasonably result in the distinction which a distiller has made. Applying the foregoing rules, the court held in Canada Dry that the distiller had failed to document its "objective criteria" by failing to reveal in depth the underlying facts from which the Director could evaluate the reasonableness of the distiller's actions. It therefore affirmed the Director's order requiring Canada Dry to "sell and continue to sell" to the petitioners.
In Canada Dry Justice Francis filed a separate opinion in which he concurred in the result, but on the ground that the *104 impact of the statute under ordinary circumstances is that any reasonably competent and financially capable wholesaler is entitled to be served and cannot be discriminated against arbitrarily. However, the majority of the court did not adopt this construction and, as heretofore noted, held that the Director is not authorized to command a distiller to distribute his product to every wholesaler who desires to purchase it, and that the statute condemns a refusal to sell only when it is found to be arbitrary.
On the basis of the Canada Dry decision we conclude that a prime distributorship is not per se a violation of the statute and that the taking away of a prime distributorship from one wholesaler and giving it to another is not necessarily improper. Thus, McCunn's elimination of McCaig as its prime distributor would not be contrary to N.J.S.A. 33:1-93.1 et seq., provided McCunn presented facts demonstrating that the action taken was reasonable, a proper and legitimate business decision, and not tending to defeat any relevant purpose or policy of the statute.
As heretofore noted, the conclusions of the Division of Alcoholic Beverage Control in the instant case were that McCunn had not established any objective criteria to justify its refusal to continue McCaig as prime distributor. The Division therefore held that McCunn's action was arbitrary and discriminatory.
We do not agree that McCunn failed to establish any objective criteria. The issue posed was a narrow one. McCunn asserted that it had eliminated McCaig as prime distributor because McCaig's performance in that capacity was inadequate. McCunn showed that McCaig had undertaken a commitment of 8,000 cases of Begg Scotch for the period ending March 31, 1962, and that on March 1, 1962 McCaig disclosed that it still had 5,200 cases on hand and would therefore be unable to make a commitment at that time for any additional purchase of Begg Scotch for the ensuing fiscal year. McCunn claimed that this performance was unsatisfactory since the commitment was reasonable in the light of previous sales' *105 figures and projections thereof. This was the basis on which it justified its action.
It is clear to us that the 8,000-case quota was an objective criterion in the sense that it was understood that McCaig would dispose of substantially all of it during the year ending March 31, 1962. But the determinative question is whether that criterion was unreasonable or excessive so as to make it arbitrary. The Division nowhere makes an express determination of this issue or, equally important, as to any of the subordinate facts which would have to be determined to permit a reasoned conclusion on the issue of arbitrariness. See D., L. & W.R. Co. v. City of Hoboken, 10 N.J. 418, 425-427 (1952).
McCaig claimed that the 8,000-case figure was high and that its failure to deplete substantially that allotment was not its fault. In addition to the number of cases which it was required to take, McCaig claimed that it was unable to retain a number of the Barry accounts, many of whom stopped buying Begg Scotch. McCaig also claimed that many of Barry's customers were stocked up immediately prior to its purchase of the accounts, and that McCunn's decision to drop McCaig, made in May 1962, some 10 or 11 months after McCaig took over the prime distributorship, did not afford McCaig a reasonable opportunity to demonstrate its ability to handle the prime distributorship.
It does not appear that any findings were made as to these disputed matters. The Division stated that McCunn's action was arbitrary but did not indicate in what way it found it to be arbitrary, other than to note that objective criteria had not been established  a determination which we have found to be incorrect.
We conclude that it was incumbent on the Division to determine whether or not McCaig's failure substantially to deplete its 8,000-case purchase, together with its resultant inability to make a new commitment, justified McCunn's decision to drop McCaig as its prime distributor. In this connection it would have to be decided whether or not the *106 8,000-case figure was reasonable in the light of past sales and depletion experiences, or any other relevant business consideration. Express findings are needed as to the figures for past sales and depletion periodically by both Barry and McCaig, as well as for the current period by McCaig alone. There is some confusion in the record in these respects. Also a factual determination would have to be made as to McCaig's contention that its disappointing performance was due to the unexpected loss of many of the Barry accounts as well as insufficient time to demonstrate its ability to handle the prime distributorship. There should be a conclusion as to the legal sufficiency of these contentions if found to be true.
The Division points out that Reinfeld's stock interest in McCunn may have influenced the selection of Reinfeld and Majestic as prime distributors, but it makes no express finding on this point. If material to the Division's final conclusions, such a finding should be made.
Resolution of all of the foregoing issues was vital to a reasoned determination as to whether or not McCunn's action was arbitrary within the meaning of the statute.
McCunn also contends that N.J.S.A. 33:1-93.1 et seq. is unconstitutional because it does not establish a definite standard by which the Director may determine whether or not the refusal to sell is arbitrary. We find no merit in this contention. The fact that the statute is cast in broad terminology is not fatal so long as a sufficient standard is indicated. As is stated in Ward v. Scott, 11 N.J. 117, 123-124 (1952):
"* * * [T]he exigencies of modern government have increasingly dictated the use of general rather than minutely detailed standards in regulatory enactments under the police power."
And see R.H. Macy & Co., Inc. v. Director, Div. of Taxation, 77 N.J. Super. 155 (App. Div. 1962), affirmed o.b. 41 N.J. 3 (1963); Esso Standard Oil Co. v. Holderman, 75 N.J. Super. 455 (App. Div. 1962), affirmed o.b. 39 N.J. 355 (1963).
*107 In construing the statute in question, the Supreme Court noted in Canada Dry that the Director is empowered to determine whether a reasonable method has been employed by a distiller in the selection of wholesalers with whom he will or will not deal. Under the statute as construed in Canada Dry, where a refusal to sell is established a distiller is required to come forward and present facts showing that its refusal was reasonable and the resultant decision fairly arrived at. The statute has been before our Supreme Court on two occasions and no suggestion of its invalidity has been made. We hold the statute is not unconstitutional for the reasons asserted.
Ancillary to the foregoing, McCunn argues that the failure of the Director to adopt implementing regulations, as suggested in Canada Dry, results in a situation where each case is decided on an ad hoc basis. The statute, says McCunn, does not accord the Director such power. We do not agree that such is the result. Implementing regulations which "delineate the grounds and the nature of the showing required" might well promote the fair and proper administration of the statute. See R.H. Macy & Co., Inc. v. Director, Div. of Taxation, supra (per curiam opinion of the Supreme Court). However, the statute is not unenforceable without them. We note that since the institution of these proceedings the Division has promulgated a regulation governing the administrative procedure before the Division in cases of this kind. However, this does not serve the purpose of the suggestion of the Supreme Court in Canada Dry.
McCunn repeats its argument made before the Division that a wholesaler whose authorization as a distributor is reduced to a writing fixing a length of time for the duration thereof can have no claim under the statute. We conclude, however, as did the Division, that the statute transcends contractual rights and obligations.
We will retain jurisdiction of this appeal and remand the matter to the Division for the limited purpose of making findings and conclusions as to the matters heretofore indicated, *108 or as to any others relevant to the ultimate decision of the Division. These findings and conclusions should be made and filed with this court within 90 days, following which the parties should apply for directions as to further briefs and argument. In the meantime, the order of March 12, 1963 is to remain in full force and effect. The allowance of costs will await the final outcome of the appeal.