891 A.2d 1204

R & R MARKETING, L.L.C., PETITIONER–RESPONDENT, AND ROYAL DISTRIBUTORS & IMPORTERS, LTD., INC., AND REITMAN INDUSTRIES, PETITIONERS, v. JIM BEAM BRANDS CO. AND FUTURE BRANDS, L.L.C., RESPONDENTS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued telephonically December 16, 2005—Decided February 23, 2006.

Before Judges LEFELT, HOENS and R.B. COLEMAN.

*Ross A. Lewin* argued the cause for appellants (*Windels, Marx, Lane & Mittendorf,* attorneys; Mr. Lewin, of counsel and on the brief; *Antonio J. Casas,* on the brief).

*Edward G. D'Alessandro* argued the cause for respondent (*D'Alessandro, Jacovino & Gerson,* attorneys; Mr. D'Alessandro and *Frederick E. Gerson,* on the brief).

*Lisa Hibner Tavani,* Deputy Attorney General, argued the cause for Division of Alcoholic Beverage Control (*Peter C. Harvey,* Attorney General, attorney; *Ms. Tavani,* on the brief).

The opinion of the court was delivered by

LEFELT, J.A.D.

Since prohibition, New Jersey has utilized a three-tier alcoholic beverage distribution system. *See Grand Union Co. v. Sills,* 43 *N.J.* 390, 399, 204 *A.*2d 853 (1964); *Public Safety and Defense Committee Statement, L.* 1985, *c.* 258; *N.J.S.A.* 33:1–3, –9. The

three-tiers include retailers, wholesalers, and suppliers. The term supplier includes manufacturers, importers, blenders, distillers, rectifiers, and wineries. *See N.J.S.A.* 33:1–93.6; *N.J.S.A.* 33:1–3.1(b)(8) (the public policy of New Jersey is to maintain the three tiered system). To prohibit arbitrary discrimination by suppliers in the sale to authorized wholesalers of any "nationally advertised brands" of alcoholic liquors, the Legislature in 1942, during a period of wartime liquor shortages, passed *N.J.S.A.* 33:1–93.1, the first wholesaler anti-discrimination law. *L.* 1942, *c.* 264; *Canada Dry Ginger Ale, Inc. v. F & A Distrib. Co.,* 28 *N.J.* 444, 460, 147 *A.*2d 15 (J. Francis concurring) (1958). Although the Legislature repealed the 1942 law in 1966, *L.* 1966, *c.* 59, and substituted a new wholesaler anti-discrimination statute, *N.J.S.A.* 33:1–93.6, the substituted formulation retained the phrase "nationally advertised brand." Thus, to this day, the anti-discrimination statute bars "any discrimination [in the supply of nationally advertised brands of alcohol] to wholesalers in the protected class." *American B.D. Co. v. House of Seagrams, Inc.,* 107 *N.J.Super.* 264, 267, 258 *A.*2d 129 (App.Div.1969), *aff'd,* 56 *N.J.* 164, 265 *A.*2d 544 (1970). A wholesaler company enters the protected class when a supplier designates the company "as an authorized distributor." *R & R Marketing, L.L.C. v. Brown–Forman Corp.,* 158 *N.J.* 170, 174, 729 *A.*2d 1 (1999).

This appeal causes us to address the meaning of "nationally advertised," which is undefined in the wholesaler anti-discrimination law and has never been amended by the Legislature or interpreted by any appellate court in a reported decision in over sixty years.[1] We conclude that to be a "nationally advertised brand," under the statute, the brand must be popular or widely known, sought-after, *and* have had some form of national pro-

---

1 In *Hoffman Import & Distrib. Co. v. S.S. Pierce Co.,* No. A–364–68 (App.Div. September 30, 1969) (slip op. at 7–8), we affirmed the Alcoholic Beverage Control Director's decision concluding that distributor S.S. Pierce need not continue to supply wholesaler Hoffman with certain alcoholic beverages bearing the Pierce brand because the brands were "not nationally known, or in the

motion. To qualify as nationally advertised under the statute, no particular amount of money must be spent on traditional media ads, and any promotional activities directed at consumers or the public generally and projected nationally beyond local or regional markets can qualify, including, for example, sponsorship of national sports teams or events, national point-of-sale advertising, and national billboard promotions.

## I.

■ Before setting forth how the dispute over the meaning of the phrase "nationally advertised brand" developed in this case, we first set forth the legislative context in which the phrase must be construed. A general review of the legislation and the implementing regulations concerning alcoholic beverages in New Jersey reveals a long-standing legislative plan aimed at "curbing relationships and competitive practices which improperly stimulate sales and thereby impair the State's policy favoring trade stability and the promotion of temperance." *Heir v. Degnan*, 82 *N.J.* 109, 114, 411 *A.*2d 194 (1980).

The wholesaler anti-discrimination law passed in 1942 was part of a legislative plan to ensure trade stability and protect "the public through the promotion of temperance and elimination of the racketeer and bootlegger." *Canada Dry, supra*, 28 *N.J.* at 455, 147 *A.*2d 15. The statement attached to the 1942 bill heralded its purpose as insuring "an equitable basis for competition between all licensed wholesalers of alcoholic beverages in New Jersey and to prevent any monopolistic freezing-out of one wholesaler by another by preventing the sale of certain products to him." *L.* 1942, *c.* 264.

■ In 1966, the Director of the Division of Alcoholic Beverage Control (Division or ABC Division) ruled that the 1942 anti-

category of 'Johnnie Walker,' 'White Label,' 'Four Roses,' 'Gordon's Gin,' or the like," .... Its distributive area ... is very limited .... Its advertising of its 'alcoholic beverages' is 'regional' only and so limited in financial outlay as to negate 'national advertising' within the fair meaning of the statute."

discrimination statute did not cover wines. *Hoffman Import & Distrib. Co. v. Frederick Wildman & Sons,* ABC Bulletin 1682 (May 18, 1966) (slip op. at 10). Shortly thereafter,[2] the Legislature repealed the 1942 statute and substituted the present formulation, which precludes "discrimination[3] in the sale of any *nationally advertised brand* of alcoholic beverage other than malt alcoholic beverage, by importers, blenders, distillers, rectifiers and wineries, to duly licensed wholesalers of alcoholic beverages who are authorized by such [suppliers] to sell such *nationally advertised brand* in New Jersey." *N.J.S.A.* 33:1–93.6 (1966) (emphasis added).

The current statute not only retained the phrase "nationally advertised brand," from the 1942 statute, but also repeated the phrase twice. *Compare N.J.S.A.* 33:1–93.1 (1942) *with N.J.S.A.* 33:1–93.6. Thus, we conclude that whatever meaning the Legislature intended for "nationally advertised brand" in 1942 remained the same when embodied within the 1966 enactment.

## II.

With this statutory framework in mind, we move on to explicate the current dispute. In May 1997, Jim Beam Brands Company, a supplier, advised Royal Distributors & Importers, Ltd., Inc., and

---

[2] The Director's decision in *Wildman & Sons, supra,* was entered on May 18, 1966 and the 1966 amendment became effective on June 2, 1966. *L.* 1966, *c.* 59, § 6.

[3] The 1966 statute required the Director "to determine whether or not the refusal to sell was discriminatory." *N.J.S.A.* 33:1–93.7; *see Joseph H. Reinfeld, Inc. v. Schieffelin & Co.,* 94 *N.J.* 400, 410–11, 466 *A.2d* 563 (1983). There are approved reasons why suppliers may refuse to sell to wholesalers that do not constitute discrimination. These include, for example, bankruptcy, lack of financial resources, and product disparagement. *N J.A.C.* 13:2–18.1(b). A legitimate business decision is not an approved reason. *See and compare American B.D. Co., supra,* 107 *N.J.Super.* at 267, 258 *A.2d* 129, *with Hoffman v. Hock,* 8 *N.J.* 397, 86 *A.2d* 121 (1952)(construing the 1942 law directing the ABC to determine whether a supplier's "refusal to sell [was] arbitrary or not"); *see also James M. McCunn & Co., Inc. v. Fleming & McCaig, Inc.,* 81 *N.J.Super.* 97, 104–05, 194 *A.2d* 749 (App.Div.1963).

Reitman Industries, New Jersey wholesalers of alcoholic beverages, that it was terminating their distribution relationship. Royal and Reitman, along with a joint venture that they had recently formed, R & R Marketing, L.L.C., petitioned the ABC Division, claiming Jim Beam was violating the anti-discrimination statute, *N.J.S.A.* 33:1–93.6, and its implementing regulations.

Petitioners sought from the Division and obtained an order directing Jim Beam to continue to sell nationally advertised alcoholic beverages to them during the pendency of the action. In response, Jim Beam claimed that almost all of the disputed brands were not nationally advertised and continued to refuse to supply these brands to petitioners. Shortly thereafter, the ABC Director interlocutorily ordered Jim Beam to continue to supply all products to Royal and Reitman pending a plenary hearing, which was to be conducted by an administrative law judge (ALJ) from the Office of Administrative Law (OAL).

In the transmittal of this matter to the OAL, the ABC Director stated that the administrative case law regarding "what constitutes a nationally advertised brand" has "varied over the years." The Director instructed that "[i]n light of modern technology, cable television and internet activities, and the supplier's and wholesaler's use of point-of-sale promotional supports, a fresh look at what constitutes a nationally advertised brand may be in order."

The Director's interlocutory order, requiring that Jim Beam continue to sell to R & R, remained in effect while the discrimination dispute was held in abeyance pending the outcome of related litigation concerning the creation of R & R and whether Royal and Reitman had forfeited their statutory protections by transferring all of their operations to R & R. *See R & R Marketing, L.L.C. v. Brown–Forman Corp.,* 307 *N.J.Super.* 474, 704 *A.*2d 1327 (App. Div.1998), *rev'd,* 158 *N.J.* 170, 729 *A.*2d 1 (1999).

Eventually, R & R was found to have succeeded to the statutory protections held by Royal and Reitman and the discrimination dispute was reactivated. R & R, Royal, and Reitman filed unsuc-

cessful motions for summary judgment; Future Brands L.L.C.,[4] another supplier, was added to the pending anti-discrimination litigation; and the parties agreed that should discrimination be found, R & R would be the sole party entitled to any relief.

The ALJ assigned to hear this matter by the OAL conducted multi-day hearings regarding the meaning of "nationally advertised brands." The specific issue addressed by the ALJ was whether Jim Beam in 1997 could have legally refused to sell to R & R the following brands of alcoholic beverages: Jim Beam Rye Whiskey; Calvert Gin and Extra Blended Whiskey; Clear Springs Grain Alcohol; Don Q Rum Cristal and Gold; Gilbey's Gin and Vodka; Kamora Coffee Liqueur; Lord Calvert Canadian Whiskey; Old Grand–Dad Straight Bourbon Whiskey 86 and 100; several flavors of Leroux brandies, liqueur, Sloe Gin, and schnapps; several flavors of DeKuyper schnapps, margarita, and liqueur; and Nocello Walnut Liqueur.[5]  It was conceded that Jim Beam Bourbon and Booker Noe's were nationally advertised

---

[4] Because Future Brands succeeded to the rights of Jim Beam only with respect to Nocello Walnut Liqueur and two brands of Don Q Rum and, therefore, has limited interest in this appeal, we generally refer to both suppliers, for ease of reference, as Jim Beam.

[5] A complete list of the disputed brands at the hearing follows: Jim Beam Rye Whiskey 80%; Calvert Gin 80%; Calvert Extra Blended Whiskey 80%; Clear Springs Grain Alcohol 190%; Don Q Rum Cristal and Don Q Rum Gold; Gilbey's Gin 80%; Gilbey's Vodka 80%; Kamora Coffee Liqueur 53%; Lord Calvert Canadian Whiskey 80%; Old Grand–Dad Straight Bourbon Whiskey 86% and Old Grand–Dad Straight Bourbon Whiskey 100%; Leroux Kirschwasser Brandy 90%; Leroux Apricot Flvd. Brandy 70%; Leroux Blackberry Blvd. Brandy 70%; Leroux Polish Blackberry Brandy 70%; Leroux Amaretto di Estasi Liq. 48%; Leroux Butterscotch Schnapps 25%; Leroux Crème de Banana 48%; Leroux Crème de Cacao Liq. 54% (Brown); Leroux Crème de Cacao Liq. 48% (White); Leroux Crème de Cassis 35%; Leroux Crème de Menthe 48% (Green); Leroux Crème de Menthe 48% (White); Leroux Crème de Noya Almond 48%; Leroux Blue Curacao Liq. 54%; Leroux Melon Liq. 46%; Leroux Peach Schnapps 30%; Leroux Peppermint Schnapps Liq. 40%; Leroux Rasberry Liqueur; Leroux Rock and Rye Liq. 60%; Leroux Sloe Gin 48% and Leroux Triple Sec Liq. 48%; DeKuyper Apple Barrel Schnapps 48%; DeKuyper Bluesberry Schnapps 30%; DeKuyper Buttershots Schnapps 30%; DeKuyper Cactus

brands. Consequently, they are not at issue in this appeal, and Jim Beam will continue to supply these products to R & R.

The ALJ considered testimony, either live or transcribed from prior proceedings, from two Senators who sponsored the 1966 amendment to the discrimination law, wholesaler representatives, a former Director of the Division, an officer and consultant of R & R, an officer and other representatives of the suppliers, retailer representatives, and experts in advertising and marketing.

Jim Beam argued vigorously that the testimony and prior administrative decisions established that nationally advertised has a well known meaning. It consists of media advertising on a nationwide basis, which is national in scope, sustained and recent, and geared and oriented toward the general public. Other self-promoting activities are merely consumer or trade promotions. According to Jim Beam, point-of-sale material is not advertising but is promotional material. Point-of-sale materials are used to catch a consumer's attention in a retail store. Such materials appear where products are displayed and can include information on how to make certain cocktails or such materials as condiment trays, napkin holders for restaurants, t-shirts, shot glasses, and banners. To be national advertising, according to Jim Beam, the annual advertising support for each of the brands at issue must exceed $1 million.

In this case, according to Jim Beam, none of the disputed brands meet the recognized meaning of national advertising. The overwhelming majority of paid media advertising was for Jim Beam Bourbon, which was conceded to be a nationally advertised brand. In 1997, the total media advertising expenditure was $8.4 million with $6.4 million spent on Jim Beam Bourbon and none spent on the brands at issue in this case.

---

Juice Margarita 30%; DeKuyper Hot Damn Cinn. Schnapps 48%; DeKuyper Key Largo Tropical Schnapps 30%; DeKuyper Peachtree Schnapps 42%; De-Kuyper Peppermint Schnapps 60%; DeKuyper Razzmatazz Liq. 33%; DeKuyper Root Beer Schnapps 45%; DeKuyper Wilderberry Schnapps 30% and DeKuyper Mad Melon Watermelon, and Nocello Walnut Liqueur.

The suppliers spent no money for paid advertisements in 1994 to 1997, the years accepted by both parties as at issue in this case, for Calvert Gin, Clear Springs, Gilbey's Gin, Gilbey's Vodka, Jim Beam Rye, Leroux brands, Nocello Walnut Liqueur, and Old Grand–Dad.

Jim Beam purchased minimal advertising for Kamora in 1995 and 1996 for the introduction of two new flavors. In 1995, outdoor posters for Lord Calvert, a Canadian whiskey, appeared in five states and in 1996 in six states, but New Jersey was not one of them. In 1996, Future Brands spent $72,000 on magazine advertisements for Don Q. In four years, Jim Beam spent $3,600 in advertising for Calvert Extra, and advertised Gilbey's Gin heavily in the early 1990s, trying, allegedly unsuccessfully, to elevate it into an image brand.

Jim Beam conducted no media advertising for any DeKuyper brands in 1994 and 1995, and spent only $1,800 for such in 1996. In 1997, Jim Beam advertised DeKuyper Peachtree in alternative weekly newspapers for seven weeks in twenty-seven markets. In addition, DeKuyper was one of a number of sponsors in the winters of 1993–94 and 1994–95 of the Women's Professional Ski Tour.

Press releases from 1994 through 1997 included mention of all of the brands in boilerplate language usually in the last paragraph of the press release. But there were no known instances, during this period, where a publication had published the boilerplate.

In 1997, only approximately eighteen percent of American households were connected to the internet. Internet advertising was still in its infancy and very primitive in form. R & R was not able to ascertain how much incidental mention of the brands at issue occurred on the internet in 1994 to 1997. Only DeKuyper had its own website launched in June 1995 and terminated five months later.[6]

---

[6] The record does not contain information regarding the subsequent history of internet activity relating to the promotion of any of the disputed brands.

Because of the minimal paid media advertising for all the brands at issue and the well-known meaning of national advertising, Jim Beam argued before the ALJ, the Director, and now before us, that none of the disputed brands had been nationally advertised. Consequently, they were not protected by the anti-discrimination statute. The ALJ rejected this argument.

She concluded that all of the disputed brands were national brands covered by the anti-discrimination statute except for Jim Beam Rye, Clear Springs Grain Alcohol, and Nocello Walnut Liqueur. The ALJ believed that the phrase nationally advertised brands was utilized merely to distinguish local or private label brands from those that are widely distributed, popular, and well known throughout the country.

The ALJ found persuasive the testimony by the retailer and wholesaler representatives explaining that "in the alcoholic beverage industry in this state the term 'nationally advertised' has meant well know[n], popular and sought-after brands." She found that all the previous administrative alcoholic beverage discrimination cases involved local products that were not nationally distributed. She stated: "The Director has never considered products like here the majority of which are popular, sought-after products that are distributed in 40 to 50 states." The *Adams Liquor Handbook*, Adams Beverage Group (1998), included DeKuyper, Gilbey's Vodka, Lord Calvert, Gilbey's Gin, Leroux, Calvert Extra, Old Grand–Dad and Kamora brands within the top 140 best selling brands. According to the ALJ, none of the previous administrative decisions addressed "the fact brought out here that the term nationally advertised in the industry in this State meant well known or sought-after and did not refer to advertising per se."

Accordingly, she held that "nationally advertised" does not refer to actual advertising programs but rather to well-known and widely distributed products. Because there was no showing of any involvement of the advertising industry in drafting or sponsoring either the 1942 or 1966 statute, she rejected Jim Beam's argument that the plain meaning of the term nationally advertised

proved the disputed brands were not protected by the anti-discrimination law.

She stated that if "nationally advertised requires a sustained nationally advertised campaign of a million dollars . . . then a tiny percent of the brands sold in New Jersey are covered by the [statute]. Surely this would change the balance that currently exists between suppliers and wholesalers." The New Jersey Beverage Journal of September 2003 showed 2,466 brands of spirits and 13,852 wines sold in New Jersey. But only forty-four had advertising expenditures of over $1 million. There was no data for wine for 1997, but in 2000, only thirty-three had advertising expenditures of over $1 million. She therefore concluded that the only interpretation that achieves the purpose of the statute of ensuring independence of wholesalers is that "nationally advertised" means brands that are "widely distributed and sought after."

The Director agreed with the ALJ's legal conclusion and concurred that the DeKuyper brands, Gilbey's Gin, Gilbey's Vodka, Kamora, Lord Calvert, Old Grand–Dad, Calvert Gin, Calvert Extra, the Leroux brands, and Don Q rum are nationally advertised brands within the meaning of the term in *N.J.S.A.* 33:1–93.6. Only Jim Beam Rye, Clear Springs Grain Alcohol, and Nocello were not popular or sought-after and therefore were not covered by the statute. According to the Director, the brands the ALJ found to be covered by the statute were exactly the type the Legislature intended to protect when enacting the statute.

The Director agreed with the ALJ that Jim Beam advocated an overly technical definition of "nationally advertised brand" that would render meaningless the anti-discrimination statute. The Legislature used the term "nationally advertised brands" only to distinguish uniquely local and private brands from those brands that were nationally familiar and sought-after products. Covered by the legislation, according to the Director, are not only brands on which suppliers spend millions of dollars each year in traditional advertising media, but also products that are of such a recog-

nized status that they do not need to be constantly advertised in the traditional media.

The Director believed that the ALJ's decision was not inconsistent with prior administrative decisions dealing with *N.J.S.A.* 33:1–93.6. He concluded that the products discussed in the cases were of limited distribution and mostly proprietary. While recognizing that advertising or marketing expenditures are clearly elements to consider in analyzing whether a product is a nationally advertised brand, the Director found other factors, such as marketing plans, name recognition, geographical distribution, and public perception are relevant. The Director affirmed the ALJ and ordered Jim Beam and Future Brands to supply R & R with normal requirements of DeKuyper, Gilbey's Gin and Vodka, Kamora, Lord Calvert, Old Grand–Dad, Calvert's Gin and Extra, Leroux, and Don Q Rum.

## III.

After reviewing the Director's final decision, Jim Beam and Future Brands appealed to this court, claiming that the Director had improperly held that brands of alcoholic beverages that were not nationally advertised nonetheless constitute nationally advertised brands under the anti-discrimination statute. According to Jim Beam, the Director confused extensive distribution with national advertising.

We recognize some ambiguity in the Director's opinion, especially with regard to his reference to the relevance of advertising in deciding whether a brand has been nationally advertised. We agree with Jim Beam that the Director's decision can be read to include as nationally advertised brands those that have not been promoted nationally in any way.

Of course, we are not bound by an agency's statutory interpretation or its determination of a strictly legal issue. *Mayflower Sec. Co. v. Bureau of Sec.*, 64 *N.J.* 85, 93, 312 *A.2d* 497 (1973). We are nevertheless aware of the deference we generally

accord administrative agency decisions. *Campbell v. Dep't of Civil Serv.,* 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963). Ordinarily, we will not overturn an agency's decision unless it was arbitrary, capricious or unreasonable, or violated legislative policies expressed or implied in the act governing the agency. *Ibid.*

Moreover, we acknowledge that when construing a statute, an agency's longstanding interpretation is entitled to great weight. *Honachefsky v. N.J. Civil Serv. Comm'n,* 174 *N.J.Super.* 539, 542, 417 *A.*2d 67 (App.Div.1980). "The meaning ascribed to legislation by the administrative agency responsible for its implementation, including the agency's contemporaneous construction, long usage, and practical interpretation, is persuasive evidence of the Legislature's understanding of its enactment." *Cedar Cove, Inc. v. Stanzione,* 122 *N.J.* 202, 212, 584 *A.*2d 784 (1991).

In this case, however, the agency's long standing interpretation differs substantially from the ALJ's construction that was adopted by the ABC Director. In each prior administrative decision that considered whether a brand was nationally advertised, the decisional rational was to examine the nature and scope of the promotional activities to determine whether they can be considered "national advertising." *E.g., Banner Liquor Co. v. Guild Wineries & Distilleries, Inc.,* ABC Bulletin 2247 (1977) slip op. (Nov. 24, 1976); *All State Wine & Spirits, Inc. v. Laird's, Inc.,* ABC Bulletin 2181 (1975) slip op. (Feb. 24, 1975); *American B.D. Co. v. House of Seagrams, Inc.,* ABC Bulletin 1845 (1969) slip op. (Jan. 30, 1969); *Hoffman Import & Distrib. Co. v. S.S. Pierce Co.,* ABC Bulletin 1818 (1968) slip op. (Aug. 21, 1968) and ABC Bulletin 1826 (1968) slip op. (Oct. 9, 1968); *Wildman, supra,* ABC Bulletin 1682 (1966) slip op. (May 18, 1966); *Hoffman Import & Distrib. Co. v. Peerless Importers, Inc.,* ABC Bulletin 1584 (1964) slip op. (Sept. 8, 1964).

In no prior administrative decision, did the Director ignore or attempt to minimize the importance of national advertising, and in some instances the Director rejected similar definitions to those advanced in this case. *E.g., Banner Liquor, supra,* ABC Bulletin

2247 at 2, 7, 8 (rejecting the contention that any brand that was not a local or "house" brand was nationally advertised and that the statutory term's meaning was found in advertising trade terminology). The prior decisions generally accept the components of a nationally advertised brand to be advertising on a national basis, national in scope, sustained and recent exposure, and geared and oriented to the consumer and the general public. *E.g., Laird's, supra,* ABC Bulletin 2181 at 8; *Banner Liquor, supra,* ABC Bulletin 2247 at 7.

In *Laird's,* for example, the dispute involved a wholesaler of an apple brandy known as "Apple–Jack," which was supplied by Laird's. The Director declined to apply the anti-discrimination statute in this case because the brand was "regionally advertised in states along the eastern seaboard" and thus was not nationally advertised. *Id.* at 9. The Director specifically noted there that "[p]etitioners [ ] confuse national distribution with national advertising," and stated "[i]f the Legislature intended to use the distribution of products as a criterion, they would have so stated and included that term in the Act." *Id.* at 10.

In *Banner Liquor,* a series of wholesalers challenged the Guild Winery decision to terminate them as distributors of wine sold under the "Roma" name. The Director found that brands covered by the statute must be "advertised substantially throughout most of the country" and that "mere sales, without concomitant advertising, [is] not determinative." ABC Bulletin 2247 at 8. According to the director, "[t]he limited geographical advertising [of Roma wines], at most, amount[ed] to regional, not national advertising." *Ibid.*

The ALJ in the current dispute attempted to distinguish the prior administrative decisions involving the anti-discrimination statute. She stated that all of the products considered previously were local products, not nationally distributed, and the Director had never considered products which are popular and sought after in at least forty states. This statement is not fully supported by the prior cases. In *Wildman & Sons, supra,* ABC Bulletin 1682

at 2, 9, for example, the hearing examiner stated that Wildman's wines and liquors were distributed throughout the United States. Wildman was the exclusive agent for various producers and shippers of French, German, and Italian wines, and a division of Almaden Vineyards. *Ibid.* Even though the products were widely distributed, the hearing officer concluded that the products were not nationally advertised brands because they had been promoted only in local trade journals and in brochures sent out upon request. The Director agreed with the hearing officer's recommendation. In *Banner Liquor, supra,* ABC Bulletin 2247 at 6, 8, the Director concluded that Roma wines, sold in thirty-five to thirty-eight states, were not nationally advertised. And in *Lairds, supra,* ABC Bulletin 2181 at 6, 11, the Director concluded that Laird's Apple Jack, sold in over thirty states, was not nationally advertised. Thus, the Director previously held that widely distributed products were not nationally advertised brands as understood by the statute.

In *Banner Liquor, supra,* ABC Bulletin 2247 at 7, the litigants advanced a standard that closely parallels the standard adopted by the ALJ and Director in this case. The Director ruled, however, that without national advertising, even brands that were widely distributed and popular would not be included within the anti-discrimination statute. *Ibid.* The converse, however, caused a different result as early as 1964, when a "Hankey Bannister" brand was found by the Director to be nationally advertised even though its distribution was limited. *Peerless, supra,* ABC Bulletin 1584 at 4–7. Hankey Bannister was distributed in only twelve states but advertised in the New York Times and New York Herald Tribune. *Id.* at 4.

■ Since 1966, the Legislature has not found it necessary to define "nationally advertised brands," or further amend the anti-discrimination statute. The inaction by the Legislature since 1966 in the face of the relatively consistent and continued emphasis on national advertising by the Division is further support for this construction of the statute. *See Malone v. Fender,* 80 *N.J.* 129,

137, 402 *A*.2d 240 (1979). "Such long-standing practice may, in some cases, be more determinative of legislative intent than the agency's recent, conflicting interpretation." *Last Chance Dev. P'ship v. Kean*, 119 *N.J.* 425, 434, 575 *A*.2d 427 (1990). Moreover, " 'an administrative agency may not, under the guise of interpretation, extend a statute to give it a greater effect than its language permits.' " *Plata v. Div. of Alcoholic Beverage Control*, 360 *N.J.Super.* 92, 99, 821 *A*.2d 542 (App.Div.2003) (quoting *GE Solid State, Inc. v. Dir., Div. of Taxation*, 132 *N.J.* 298, 306, 625 *A*.2d 468 (1993)).

As the Director has previously recognized, he has no power "to overrule ... long-standing interpretation of the statutory language in question." *Banner Liquor, supra,* ABC Bulletin 2247 at 8. "If the statute does not provide sufficient protection to New Jersey wholesalers ... the remedy lies in statutory amendment by the Legislature, not in a re-interpretation by this Division of the language at this late date." *Ibid.* Therefore, we conclude that to the extent the Director's decision interpreting the anti-discrimination statute extends protection to brands with no national advertising whatsoever, it contradicts the statute and must be reversed.

## IV.

We proceed to interpret the anti-discrimination statute and pronounce what we believe the legislature meant by the term "nationally advertised brands." While guided by the prior administrative decisions of the Division, we note that the circumstances today are different from the situation in 1942 and even 1966. Recently, for example, our Supreme Court recognized that it was "not so easy to reconcile the promotion of temperance with the parallel goal of consumerism that is reflected in recent deregulation of the alcoholic beverages industry." *R & R Marketing, supra,* 158 *N.J.* at 176, 729 *A*.2d 1. Furthermore, "the basic policy of the anti-discrimination law," as understood by the Supreme Court was "to protect against arbitrary action by suppliers, not to

enhance existing rights of wholesalers. The law creates no new property rights in wholesalers; it protects existing rights." *Id.* at 177, 729 *A.*2d 1.

Although the law must be liberally interpreted, we must do so only to effectuate the legislative purpose of the wholesaler anti-discrimination law. *Canada Dry, supra,* 28 *N.J.* at 455, 147 *A.*2d 15. An overly broad interpretation will improperly enhance the wholesaler's property rights and should not be countenanced. Our task is to "effectuate the legislative intent in light of the language used and the objects sought to be achieved." *Burns v. Belafsky,* 166 *N.J.* 466, 473, 766 *A.*2d 1095 (2001) (internal quotations omitted).

"[T]he statute seeks to achieve as far as necessary the independence of wholesalers from distillers. A wholesaler dependent upon a distiller for a supply of sought-after merchandise might be tempted to comply with the non-legitimate desires of the distiller if the latter were free to discontinue the supply at will." *Canada Dry, supra,* 28 *N.J.* at 455, 147 *A.*2d 15. The specific concern was that retailers or wholesalers might do anything to please their suppliers in order to obtain the sought-after alcohol, including encouraging greater sales. *Ibid.* Therefore, the law attempted to eliminate the leverage that could be achieved by suppliers through withholding certain popular brands from wholesalers by prohibiting suppliers from terminating their distribution of nationally advertised brands. *Ibid.*

Thus, the Legislature intended to protect wholesalers from a supplier's discriminatory withdrawal of popular or widely known and sought-after alcoholic beverages. It is only these widely known or popular and sought-after products whose threatened withdrawal by suppliers would create the most leverage and potential to impair wholesaler independence.

But the Legislature chose to limit the wholesalers' protection to brands that were "nationally advertised." Thus, while the legislation encompasses popular or widely known and sought-after prod-

ucts, wholesalers obtain protection vis-à-vis a particular brand only when the brand's popularity and consumer allure have been achieved through national advertising.

Just as an excessively broad interpretation would be improper, an overly technical and restrictive definition might also thwart the legislative purpose embodied in the anti-discrimination statute. For example, only 32 of the 2,466 brands of alcohol sold in New Jersey, or 1.3%, had advertising expenditures of at least $1 million in both 1996 and 1997. There is no indication in the statute that any particular amount must be spent on advertising. It is unlikely that the Legislature intended to provide protection only for those brands that expended in excess of $1 million on advertising. The extent of monies spent on promotional activities is relevant evidence in determining whether the brand is within the protection of the statute, but the amount spent is not determinative.

Furthermore, we find little support for restricting advertising to the recognized media, meaning newspapers, magazines, radio, and television. The distinction between national advertising and point-of-sale promotions comes from the hearing officer's decision in *Wildman & Sons*. The hearing officer distinguished "point-of-sale advertising" from so-called "institutional" national advertising. *Wildman & Sons, supra,* ABC Bulletin 1682 at 5. We find it significant, however, that in the final decision the Director did not so distinguish national advertising from point-of-sale advertising. In fact, the Director stated that "[a] brand may be nationally advertised in many ways." *Id.* at 10. Even "[d]irect mailing to consumers to an adequate degree may [qualify as national advertising]." [7] *Ibid.* Thus, there is support in the prior administrative decisions for promotional activities, which might qualify as nation-

---

[7] *But see Laird's, supra,* Bulletin 2181 at 8–9 where the then Director included in his final decision the hearing examiner's observation in *Wildman & Sons* that national advertising was "of the institutional type as distinguished from point-of-sale advertising, and is designed to create a favorable image of the product and the integrity of the manufacturer or producer." *Id.* at 9.

al advertising, beyond purchased advertising in the recognized media.

There is no indication, either in the legislative history or prior administrative cases, that the Legislature intended the term "nationally advertised" to be limited to advertising in the national media. In fact, in its ordinary sense, *see N.J. Coal. of Health Care Prof'ls, Inc. v. N.J. Dept. of Banking and Ins.*, 323 *N.J.Super.* 207, 261, 732 *A.*2d 1063 (App.Div.), *certif. denied*, 162 *N.J.* 485, 744 *A.*2d 1208 (1999), advertising simply means "to make publicly and generally known." *Merriam–Webster's Collegiate Dictionary* (Eleventh Edition). Although the top 50 advertised brands, or 2% of the market, account for roughly 40% of the total industry-wide sales, the purpose of the statute is to render the wholesaler independent of the suppliers for "sought-after merchandise . . . for which there is consumer demand." *Wildman & Sons, supra*, ABC Bulletin 1682 at 10. To require as part of the test only the advertising industry's definition of national media advertising conflicts with the recognition that other forms of promotion can also generate popularity and consumer demand. Accordingly, we hold that advertising includes any intentional promotional activities directed at consumers or the public generally.

In addition to traditional media advertising purchases, advertising under the anti-discrimination statute may also be placed on billboards and signs, on the internet, and on cable television. Even product placement in movies, under certain circumstances, may qualify. Advertising under the statute may also include, for example, special promotions, sponsorship of national sporting teams and events, and point-of-sale promotions. We do not read the distinction in a few of the administrative decisions between so-called "institutional" national advertising and point-of-sale advertising as concluding that point-of-sale advertising can never qualify as national advertising. We do not see a statutory difference in a promotion that brings consumers to a retail outlet to purchase a particular brand and a promotion for the same brand directed at

consumers already in the retail store. However, point-of-sale and other special promotions or advertising activities must still meet the "national" requirement.

To be national advertising, we hold that the promotional activity must be directed beyond a local or regional market encompassed by only a few states. It is not necessary that promotions target all recognized regions of the country or any particular number of states, but only if a substantial portion of the nation is targeted will the activity qualify as national advertising. Coverage of all states and all regions is, however, not necessary.

It is, therefore, the combination of a particular brand's popularity and a national promotional effort that places it within the anti-discrimination statute. A popular or widely known and sought-after brand that does not have and never had any national advertising associated with it is not included. Conversely, a brand that is not popular or widely known and sought-after, but has been nationally advertised is included within the statute during the years the brand is nationally advertised, but will not remain protected unless it becomes widely known and sought-after.

A brand that has been nationally advertised and has become widely known and sought-after retains its nationally advertised status under the statute until the brand is no longer widely known and sought-after. Precisely how long a period may pass without a popular brand being re-advertised depends exclusively on the duration of the brand's nationwide popularity. Stated differently, any brand that has been previously nationally advertised is protected as long as it remains widely known and sought-after.

A remand is required to have the Director apply the national advertising standard, as we have clarified it,[8] to each of the brands at issue including 13 DeKuyper brands, 25 Leroux brands, 2 Don

---

[8] Because we have found the Director's standard to be contrary to the statute, it is not necessary to address Jim Beam's argument regarding *Metromedia, Inc. v. Dir. Div. of Taxation*, 97 *N.J.* 313, 328–34, 478 *A.2d* 742 (1984), that the Director's standard constituted rulemaking.

Q Rum brands and 2 Old Grand–Dad brands. To evaluate these brands' popularity, the ALJ consulted the *Adams Liquor Handbook*, which listed these brand families as a unit. Consequently, the ALJ concluded that there was no need to undertake an individual assessment of each brand's popularity.

The statute speaks of a "nationally advertised brand," and the Division's regulations permit the suppliers to authorize distributors on a brand-by-brand basis. *N.J.A.C.* 13:2–33.1(6) (the brand registration form required to be filed for each brand must name the "authorized distributor[ (s) ] of the product at wholesale."). The Director recently found that a distributor could not receive and sell each flavor of Absolut solely because it was authorized to distribute Absolut Blue Vodka. *The Absolut Spirits Co., Inc. v. Monsieur Touton Selection, Ltd.*, ABC Docket No. 02–06 (2004); *see also American B.D. Co. v. House of Seagram's Inc.*, ABC Bulletin 1845(2) (1969)(holding that the advertising status under anti-discrimination law must be determined brand by brand).

■ Given the regulatory construct established by the Director, we further hold that whether any brand meets the national advertising standard of the wholesaler anti-discrimination law must be evaluated brand by brand. Therefore, popularity can not generally be determined under any particular trademark. In this case, for example, the parties agreed that Jim Beam Bourbon met the national advertising standard, but Jim Beam Rye did not. Nevertheless, listings such as *Adams Liquor Handbook* remain relevant in evaluating whether a particular brand is popular or widely known and sought-after.

In addition, when considering the advertising associated with a particular brand, the purpose and nature of the advertising or promotional effort under review becomes relevant. The anti-discrimination statute does not indicate how to apply advertising that is undertaken for a group of brands, and we cannot conclude that the law requires each individual flavor under a known brand to be analyzed separately. The record is replete with evidence of general trademark name promotion and advertising. For exam-

ple, it seems to us that when DeKuyper sponsored the women's sporting event, it intended to benefit all of its brands, and DeKuyper's briefly established website was for all flavors. On the remand, the Director should focus on the type of promotional efforts expended to determine which brands may be credited with the effort, but whether a particular brand is also widely known and sought-after must be determined brand by brand.

Before concluding this decision, we urge the Legislature to revisit this statute, which has not been amended since 1966. If we are wrong in our interpretation of "nationally advertised brands," we urge the Legislature to promptly correct our error.

## V.

In conclusion, we agree with the Director that Jim Beam's and Future Brands' construction of the anti-discrimination statute is too narrow and restrictive. However, we also agree with the suppliers that the statute protects only "nationally advertised brands." Because we have adopted a standard for adjudging national advertising that differs from that articulated by the parties and the Director, we must remand for further proceedings. The Director shall conduct whatever proceedings are necessary to determine which, if any, of the disputed brands fall within the definition of "nationally advertised brands" we have concluded best captures the Legislature's intent.

Reversed and remanded to the Director of the Division of Alcoholic Beverages.